# CHARLESTON.

### SADLER *v.* TAYLOR *et al.*

### Decided March 9, 1901.

1. PARTIES NECESSARY—*At Law and Equity.*

    While at law all persons having a joint interest must join in the action as plaintiffs, and while, in equity, this rule is preferable, it is generally sufficient if all the parties interested in the subject of the suit are before the court either as plaintiffs or defendants. (p. 115).

2. EXHIBITS—*Part of Bill—Equitable Relief.*

    Exhibits filed with a bill of complaint, and asked to be read and treated as parts of it, are so considered, as much as if they were actually incorporated in it; and, if the bill and exhibits so read present grounds for equitable relief, the demurrer is properly overruled. (p. 116).

3. DEED—*Absolute or Conditional—Parties Intention.*

    In determining whether a deed, absolute or conditional on its face, is, in fact, a mortgage, or mere security for the payment of money, the true question is whether a purchase of the property or a loan of money or forbearance of a debt was really intended by the parties to the instrument at the time of its execution. (p. 117).

4. INTENTION ASCERTAINED—*Parol Evidence and Circumstance* .

  In ascertaining what the intention of the parties was at the inception of the transaction, it is proper to consider the parol declarations of the parties and the evidence of other witnesses, together with the situation, circumstances, and conduct of the parties respecting such transaction prior to, at the time of, and after the execution of the deed. (p. 117).

5. MORTGAGE—*Security—Right of Repurchase.*

  If, by the intention of the parties, the transaction was originally a security for the payment of money, it will be held in equity to be a mortgage, and the maxim, "Once a mortgage, always a mortgage," applies, and it will remain such, unless changed by a new contract upon an adequate consideration, and so reasonable and fair as to relieve it of any suspicion of unconscientious advantage; but if, originally, the transaction was a sale of property with a right of repurchase at the option of the grantor, it is a conditional sale, and no subsequent event short of a new agreement between the parties can convert it into a mortgage. (p. 119).

6. CONSTRUCTION OF WRITTEN INSTRUMENT.

  When it is clear that after the execution of the instrument no debt remained due from the grantor to the grantee, the transaction is a contract of sale, and the deed must be given its legal effect. (p. 119).

7. SALE OF LAND—*Reservation—Mortgage.*

  A sale of land, with a reservation to the vendor of a right to repurchase it at a fixed price and at a specified time, is not prohibited by either the letter or the policy of the law, although in doubtful cases deeds containing such provisions will be held to be mortgages. (p. 120).

Appeal from Circuit Court, Mingo County.

Bill by Thomas Sadler against Charles B. Taylor and others. Decree for plaintiff, and Charles B. Taylor appeals.

*Affirmed.*

SHEPPARD & GOODYKOONTZ and CAMPBELL, HOLT & CAMPBELL, for appellants.

RUCKER & KELLER, for appellee.

POFFENBARGER, JUDGE:

All the parties to this suit are residents of the county of Victoria, Province of Ontario, Dominion of Canada, the defendant Chas. B. Taylor residing in the town of Cambray and the plain-

tiff Sadler and the defendant John D. Flavelle in the town of Lindsay.

The contract forming the subject of this controversy bears date on the 25th of October, 1892. At that time said Taylor claimed to be the owner of an undivided half of a certain large tract of coal and timber land herein known as the Hatfield lands; also an undivided one-third of another such tract of three hundred and eighty-three and three-fourths acres known herein as the Cox land; and also an undivided one-fourth of another such tract of about eight hundred sixty-eight and three-fourths acres known as the Vance lands; all these tracts being situated in Mingo County, W. Va.

As to what actual interest Taylor had in the Hatfield lands the record is not clear; but certain it is that he had not, at that time, paid anything on the purchase money. He admits that; nor had he himself paid anything on the Cox land. For these lands Robert Cox and wife had executed to Taylor and one Joseph Powell, Jr., a title bond in the sum of four thousand six hundred dollars dated March 19, 1891, in which the consideration of the purchase is specified to be four thousand six hundred dollars. The record shows an explanatory agreement, dated April 28, 1891, entered into by Taylor, Powell and one L. M. Hall, by which it is agreed that Powell and Hall shall advance Taylor's share of the purchase money as well as their own, and that when it should all be paid, the deed should be made to all three jointly, giving each an equal share therein, and all the purchase money to bear interest at six per cent., and the agreement to be embodied in the deed, which was made accordingly. On this, Taylor had paid nothing himself, all of his shares having been advanced by Powell and Hall; and, in addition, he owed his proportionate part of the expense of the development of the property to that date.

The purchase price of the Vance lands was between eight thousand dollars and ten thousand dollars on which Taylor claims to have paid five hundred dollars, being his one-fourth of two thousand dollars paid by himself, L. M. Hall, John Rapelje and Joseph Powell.

The cost of all development of these lands up to that date amounted to not more than three thousand seven hundred dollars of which Taylor's share was less than one-third. Taylor says that all he had paid and all he was liable for at that time on ac-

count of his interest in all three tracts did not exceed five thousand dollars.

Holding these interests and being thus indebted, needing money badly, Taylor, between the 21st and 25th of October, 1892, went to Lindsay where Sadler and Flavelle resided and were engaged in the milling business, (they being, it seems, the principal and controling stockholders in an incorporated concern engaged in that business), for the purpose of borrowing money or enlisting them in his land speculations. They were strangers to him, and he was introduced by one Dundas Ray to Flavelle at the mill, who, being informed as to his mission, referred him to Sadler, who was at his house, and Taylor went to see him. For what occurred there between Sadler and Taylor, we are wholly dependent upon what they say, and they do not agree. Sadler swears Taylor wanted him to join him in an investment in these lands and he finally consented to do so. Taylor swears he applied to Sadler for a loan of money, and that Sadler imposed on him the harsh terms afterwards put into the agreement of October 25, 1892.

However, they reached some agreement which they immediately laid before Flavelle, and he being satisfied with it they all went to the law office of Thomas Stewart, barrister and solicitor, to have it put in writing. At their dictation, all three being present, he made a memorandum, from which and under their instructions, he prepared the agreement of October 25, 1892.

By this contract, styled an indenture in duplicate, Taylor, in consideration of the sum of four hundred dollars, the receipt of which was thereby acknowledged, and of the further sum of two thousand six hundred dollars to be paid in installments in May and November of each year upon the share of the purchase money of the Vance lands, payable by Taylor, until said sum of two thousand six hundred dollars should be exhausted, granted to Sadler and Flavelle forever the undivided one-half of his interest in all of the said lands, describing and designating the several tracts as parcels one, two and three and including a contingent right of dower, some standing timber, separate from these tracts, and also such further or other real estate as Taylor might thereafter acquire in certain lands covered by two deeds mentioned in the description of parcel three, the Vance lands.

The agreement further provided that after said sum of two thousand six hundred dollars should be paid as aforesaid, the

share of Taylor, Sadler and Flavelle in the rents issues and profits of these lands should be applied in payment of the balance if any, of the purchase money of said parcel three including any further consideration which might be required to be paid to acquire the full ownership of an undivided one-fourth of the lands described in the last two deeds mentioned on the description of parcel three, one calling for two hundred and seventy-six and one-half acres and the other for two hundred and seventy-eight and one-fourth acres, and if then the purchase money should not all be paid, Sadler and Flavelle should advance additional sums for that purpose not exceeding one thousand dollars over and above said sum of two thousand six hundred dollars, such additional sum to bear interest at seven per cent. from the times of the respective advances, and to be repaid within four years from the date of the agreement.

It was further provided that Sadler and Flavelle might withdraw from the contract any time before January 2, 1893, after giving notice of their intention by letter; and, in that event, Taylor should repay the four hundred dollars on or before February 1, 1893, with interest at seven per cent. from the date of the contract, the lands thereby conveyed should stand as security for its repayment, and all covennants, obligations, etc., on the part of Sadler and Flavelle thereby made, should cease.

The agreement also provided that Taylor should have the option to purchase back the property thereby conveyed at any time within two years from the date of the contract, for the sum of ten thousand dollars to be paid within five years from date with interest at seven per cent. from October 25, 1894, the same to be a lien upon all of Taylor's interest in the lands; and in the event of Taylor's so repurchasing, all of his share of the rents, issues and profits in excess of one thousand two hundred dollars per year, should be applied to the payment of said sum of ten thousand dollars and interest; but said sum should be repaid in five years as aforesaid. Then the parties covenanted to execute such other and further deeds, documents, etc., as should be necessary, according to the laws of West Virginia to carry out the full intent and meaning of the contract.

On the 12th of September, 1893, Taylor, Hall, Powell, Rapelje and others (not Sadler and Flavelle, however), executed a lease of all these lands, except the Hatfield tract, to the Thacker Coal & Coke Co. for coal mining and coke making purposes only, for

the period of thirty years from the 12th of September, 1894, under which said company was to pay ten cents per ton for all coal mined, not used for making coke on the premises, and fifteen cents for every ton of coke made on the premises, to be paid quarterly, and the company was to proceed at once to develop the property, and agreed to spend thereon not less than ten thousand dollars by January 1, 1894, and to be prepared to ship coal by September 12, 1894, the company agreeing to pay the lessors six thousand dollars for the first year, dating from May 1, 1894, and ten thousand dollars for the second year, as a minimum royalty.

Another indenture made in duplicate and dated October 16, 1893, between Taylor and Barbara J. Taylor his wife of the first part, and Flavelle of the second part, recites the agreement of October 25, 1892, the ownership thereunder of Sadler and Flavelle, Taylor's option therein reserved to repurchase for ten thousand dollars, the agreement to advance the sum of one thousand dollars therein mentioned, and its subsequent advancement by Sadler and Flavelle as well as of additional sums amounting to two thousand eight hundred and eighty-seven dollars; the desire of Taylor and his wife that Sadler and Flavelle advance them still further sums; the agreement of said Sadler and Flavelle to do so, to the extent of not more than one hundred dollars per month for a period of five years, if the lessees in the lease thereto annexed should so long perform the covenants in said lease, and, in the event of their failure to do so, said advances to cease; and the agreement of Taylor and wife in consideration of the premises to assign all their interests in said lease to said Flavelle in trust for himself and Sadler; and then they do thereby so assign their interest in it to said Flavelle to apply one-half of all rentals and royalties received thereunder as follows:

*First,* in payment of all future advances Sadler and Flavelle should make for Taylor;

*Second,* to the payment of said sum of two thousand eight hundred and eighty-seven dollars and its interest;

*Third,* to the payment of said sum of one thousand dollars and interest; and

*Fourth,* if Taylor should exercise his option to repurchase contained in the contract of October 25, 1892, to the payment of said sum of ten thousand dollars and interest, by such exercise of it, to become due.

This contract also contained a clause whereby it was agreed that nothing in it should detract from or interfere with the title, estate, rights and properties, interests and securities of Sadler and Flavelle under the contract of October 25, 1892.

Another contract bearing date November 6, 1893, was made by Taylor, Sadler and Flavelle, relating to the Hatfield lands only, by which Taylor became the owner of five-twelfths of these lands, Sadler of four-twelfths and Flavelle of three-twelfths. From the recitals of this contract and the testimony of Taylor, it appears that he had contracted for these lands in September, 1893, but had paid nothing on them. By this contract it was agreed that, after all clouds had been removed from the title of said lands and Taylor declared the owner thereof free from any encumbrance thereon, Sadler should pay four-twelfths of the five thousand dollars of purchase money, Flavelle three-twelfths of it and Sadler and Flavelle the other five-twelfths thereof for and in behalf of Taylor, for the repayment of which last portion and its interest Sadler and Flavelle were to have a lien and encumbrance on all of Taylor's interest in the land; and it was agreed that one-half of Taylor's share of all the rents, royalties, etc., arising from said lands should be applied to the payment of the money so advanced, and whether the sums so derived should be sufficient to pay the amount in ten years or not, the sums so advanced should be repaid within that time. It was further agreed that these lands should be removed from the operation of the contract of October 25, 1892, so that Taylor should have no option to repurchase the same but he should nevertheless have the option to buy back the share of Sadler and Flavelle in the other property mentioned and described in said contract of October 25, 1892, at and for the price of ten thousand dollars payable as provided in said indenture.

On the 23rd of January, 1895, another writing purporting to be a deed of trust was executed by Taylor and wife, reciting that Taylor had agreed to purchase from Sadler and Flavelle their undivided one-sixth of the Cox lands and their one-eighth of the Vance lands for ten thousand dollars with interest at seven per cent. from October 25, 1894, subject to all unpaid purchase money and other encumbrances thereon, not created by Sadler and Flavelle and also to certain moneys theretofore advanced by them to Taylor; that Taylor was then indebted to them in the sum of four thousand four hundred and sixteen dollars, ad-

vanced to pay on said purchase money and for other purposes, and that they had agreed to advance further sums not exceeding three thousand dollars to complete the payment of said purchase money yet to be paid by said parties of the first part, and by it they grant to Sadler and Flavelle all their interest in said Cox land and Vance land in trust to secure the payment of said sum of ten thousand dollars and interest, of said sum of four thousand four hundred and sixteen dollars and interest and all future sums to be advanced by them not exceeding three thousand dollars and interest thereon at seven per cent. from the dates of the advancements, and after reciting the agreement of October 16, 1893, assigning the rents and royalties of said Taylor from said lands to be applied on these debts, they agree that all of said sums shall become due and payable October 25, 1897, but reserving to Taylor the privilege of paying them off at any time.

The concluding paragraph of this contract is as follows: "And it is expressly stipulated, agreed and provided that the taking of this security shall in no way impair, annul or affect any other security or securities which the parties of the second part hold for moneys and interest aforesaid, or any of them and shall in no way divest the parties of the second part of any estate or interest which they have in the said lands or in the rents, royalties, issues and profits thereof, but this deed shall stand as an additional and better security for all the aforesaid moneys and interest."

This is the last contract made between the parties as originally situated and related in respect to these lands.

About April, 1894, the connection between Sadler and Flavelle in the milling business was severed and both retired from it. Since the contract of January 23, 1895, was executed, Sadler has sold to Flavelle all the coal property he had in Mingo County, and Flavelle has taken a deed of trust, dated August 31, 1898, upon all of Taylor's property in said county to secure to himself the sum of eleven thousand five hundred and thirty dollars and seventeen cents, which constitutes a second lien upon the real estate upon which Sadler's money is secured as the first lien.

At March rules, 1899, said Sadler filed his bill of complaint against said Taylor and Barbara his wife, and John D. Flavelle trustee and also in his own right, setting forth the contracts of October 25, 1892, October 16, 1893, November 6, 1893, and January 23, 1895, alleging the substance of them and his interest

and rights thereunder, making them and a statement of Taylor's indebtedness to him amounting to nine thousand four hundred and fifty-four dollars and eighty-five cents exhibits, and asking that they be read as parts of the bill, alleging that it is apparent, from the nature and character of the several instruments of writing, executed by said parties, that there is a commingling of interests of himself and the defendant Flavelle; that he is not advised what relief (part), if any, of the moneys paid and advanced to Taylor by Flavelle have been repaid to him, and that, under the circumstances, he is advised that the intervention of a court of equity is necessary in order to have a proper construction of the several instruments therein referred to, and to have such relief as he is entitled to; and praying that the amount of his claim may be decreed to be a lien on defendant's property, and the land subjected to sale in payment thereof; and for general relief.

At May rules, 1899, the bill was taken for confessed and the cause set for hearing, and on the 16th of May, 1899, the defendants appeared and demurred to the bill, and the demurrer being overruled, Taylor and Flavelle tendered their separate answers to the bill, to the filing of which the plaintiff objected and filed his exception which were overruled, and the answers filed, to which the plaintiff replied generally. These answers being substantially the same, it will be sufficient to set forth the principal allegations of that of the defendant Taylor only.

He alleges that he became the owner of undivided interests in the said lands, subject to liens thereon for purchase money as stated in the bill; that he became financially embarrassed; that the holders of the liens were pressed for payment of their debts; that being anxious to save his property which was valuable on account of its coal, and not desiring to sell it, but hoping to borrow money to meet his portion of the liens, he went to Canada for the purpose of effecting a loan; that he there met Sadler a man of wealth and a money lender, and solicited him for a loan, to be secured on the property, and succeeded in effecting it, and secured it by the execution of the contract of October 25, 1892; that although an absolute conveyance upon its face, said contract was not intended to be, and in fact was not, such a conveyance, but had for its sole object, and was so understood by all parties thereto, the security of the loan so made to him by Sadler and Flavelle; that the four hundred dollars advanced, the two thou-

sand dollars provided to be paid by them to him in installments, and the one thousand dollars to be advanced by them in case the royalties from the property, with the four hundred dollars and two thousand six hundred dollars, did not discharge the balance of purchase money of the lands, was the measure of the loan, and the socalled deed stood as the security for the payment thereof; that at the time the contract was made, none of the parties thereto contemplated the quantity or value of the land except so far as it may have been considered as a sufficient security for said loan, and the price of four hundred dollars and two thousand six hundred dollars professedly given therefor on the face of the deed, was, if the same were to be considered as a purchase and sale, grossly inadequate, for his interest in the property at the time was worth at least forty thousand dollars; that from the date of the contract he has remained in possession of said property, and on September 12, 1893, he, together with the other owners thereof, executed a lease of a portion of the land to the Thacker Coal and Coke Company in which neither Sadler nor Flavelle joined, or pretended to, although fully cognizant of what was being done, Sadler being one of the stockholders of the lessee company; that the provision in the contract enabling Sadler and Flavelle to withdraw therefrom before January 2, 1893, in which event the land was to stand as security for the four hundred dollars, only makes it the clearer that the contract was not intended to be an absolute conveyance, but only a security for money loaned; that the option therein given him to repurchase for the sum of ten thousand dollars was nothing more nor less than one of the hard terms imposed by Sadler as a condition of making the loan, even that sum being far below the then value of the property and not considered by Sadler and Flavelle as a purchase price to be paid by him for a conveyance of the land, but as a speculation upon his necessities and one of the penalties of the redemption of his land; that he never in fact sold his property to Sadler and Flavelle, but the transaction was in the nature of a loan, and the conveyance of October 25, 1892, while absolute on its face, was in reality a mortgage to secure a loan, and his alleged repurchase at ten thousand dollars not a purchase, but simply the means resorted to by Sadler to extort money from him through his necessities, and the contract of October 16, 1893, and the deed of trust of January 23, 1895, simply additional security for said loan except that the latter embraced said sum of ten thousand dollars for

which there was no consideration; and that Flavelle was equally interested with Sadler in all the loans made by them to him evidenced by said contracts and deeds, and he, treating said contract of October, 1892, as a mere security for a loan, had made a settlement with respondent and accepted four thousand one hundred and forty-one dollars and eighty-five cents with six per cent. interest as the true amount due him, and refused to assert even any claim to his supposed one-half of the alleged ten thousand dollars purchase money described in the deed of trust of January 23, 1895. Then, offering to pay Sadler four thousand one hundred and forty-one dollars and eighty-five cents with proper interest thereon as one-half of the true amount loaned and advanced by Sadler and Flavelle and as all that is due him on account of their transactions, respondent prays that the indenture of October 25, 1892, be declared a mortgage upon the property to secure the payment of the loans therein described; that Sadler be compelled to receive said sum of four thousand one hundred and forty-one dollars and eighty-five cents in full satisfaction of his part of the loans made to respondent mentioned in said contracts of October 25, 1892, and October 16, 1893; and that each of said contracts and deeds of trust be declared satisfied and cancelled.

The depositions of Sadler and Thos. Stewart were taken for plaintiff, and those of Taylor and Flavelle for defendant, with which several papers, including memoranda, receipts and contracts, were filed as exhibits, and on January 16, 1900, the cause having been argued and submitted on September 19, 1899, and leave given to file briefs, a final decree was made in the cause, in which it was decreed that Sadler recover of the defendant Taylor the sum of nine thousand seven hundred and seven dollars and thirty-six cents with legal interest thereon from that date until paid, with his costs, and further that the same constitutes a lien on the lands described in the deed of January 23, 1895, from that date, and that unless within sixty days from the date of the decree, Taylor or some one for him should pay said sum, the land be sold. From this decree an appeal was applied for by Taylor to this Court, and granted.

In the assignments of error there are but two questions presented. The first is as to whether the demurrer should have been sustained; and the second, as to whether the conveyance of Octo-

ber 25, 1892, was an absolute conveyance or a mortgage to secure the repayment of borrowed money.

It is urged in support of the demurrer that it was error to make Flavelle a defendant instead of joining him as a plaintiff, and that the allegations of the bill are not sufficient grounds for the relief prayed for. At law, persons jointly interested in the object of the suit must stand on the same side of the case upon the record, but in equity, while it is proper so to arrange the parties, it is generally held to be sufficient if all persons interested in the subject matter of the cause be made parties thereto, either as plaintiffs or defendants. In equity, all parties to the suit are, or may be, actors therein without regard to the formal positions on the record, and ordinarily it is a matter of little consequence whether a party appears as a complainant or a defendant, for the court can make such decree as the exigencies of the case may require, decreeing for or against one or more of the several plaintiffs and for or against one or more of the several defendants. Enc. Pl. & Prac. 672.

"In equity it is sufficient that all the parties in interest are before the court as plaintiffs or as defendants; and they need not, as at law, in such case, be on opposite sides of the record." 1 Story's Eq. Jur. 630.

"The court can only decree as between parties to the suit, but in equity it is not essential as at law, that the parties litigant should be on opposite sides of the case." *Piatt* v. *Oliver,* 3 McLean's Rep. (U. S.) 27.

"The position of the parties on the record as plaintiffs or defendants is immaterial; all are actors." Mr. Justice Gray in *McArthur* v. *Scott,* 113 U. S. 386. "While at law all persons having a joint interest must join in the action as plaintiffs, in equity the general rule is, it is sufficient if all the parties interested in the subject of the suit are before the court either as plaintiffs or defendants." *Parkham* v. *Aicardi & Tool,* 34 Ala. 393.

In *Fleming, Adm.* v. *Holt et al.,* 12 W. Va. 143, a *cestui que trust* made his trustee in a deed of trust and the grantor therein defendants in his bill, and the court held that while the trustee might have been more appropriately joined as a plaintiff, it was sufficient that he was made a defendant. In *Tavener* v. *Barrett,* 21 W. Va. 656, a vendor sued for the specific execution of his contract of land of real estate and collection of the urchase money for which his agent had taken bonds payable to himself, by virtue of

which said agent was held to be a trustee, holding the legal title to the bonds for the use of the vendor, and the court held that th trustee or agent must be made a party either as plaintiff or defendant, and that he might be made either a co-plaintiff with the vendor or a defendant with the vendee.

Flavelle, having been made a defendant and sustaining on the face of the bill, the double relation towards Sadler, of trustee and and a person jointly interested with him as purchaser and incumbrancer or mortgagee, as the case may be, and it also appearing from the bill that he is a non-resident, a fact generally held to constitute a sufficient reason for making a person a defendant, who otherwise would more properly be a co-plaintiff, the demurrer cannot be sustained upon the ground that Flavelle is made a defendant instead of a co-plaintiff. The other ground of objection to the bill is that it does not contain sufficient allegations to warrant the granting of the relief prayed for. While the bill is very imperfect in form, and without the exhibits filed with it, would undoubtedly be bad upon demurrer, the plaintiff asks that the exhibits be read and treated as parts of his bill, which makes them as much parts of it as if incorporated in it. Bar Ch. Prac. 278; *Johnson* v. *Anderson,* 76 Va. 766; *Thompson* v. *Clark,* 81 Va. 422.

From the facts alleged in the bill and appearing in the exhibits, it appears that Taylor is largely indebted to the plaintiff; that the latter has a lien upon Taylor's property to secure the payment of that indebtedness, and that the so-called deed of trust securing it cannot be executed *in pais* because the creditors are themselves made the trustees therein and because the plaintiff does not know the actual amount due and owing to him from Taylor. The demurrer was properly overruled.

The real question in the cause is whether the conveyance by Taylor to Sadler and Flavelle of the undivided one-half of his said land by the contract of October 25, 1892, was a conditional sale of said real estate or simply a conveyance to them to secure the payment of money advanced or loaned by them to him, and therefore, in substance and effect, a mortgage; and this question, I am convinced, turns wholly upon the intentions of the parties at the time of its execution. While a number of rules are laid down by the courts by which to be guided in arriving at a conclusion concerning a transaction of the kind presented here, it is perfectly clear from an examination of the authorities that these

rules are only adopted and adhered to as an aid or guide in the determination of what were the actual intentions of the contracting parties. If the intention is found to have been a loan secured by the written instrument in question, then it is adjudged to have been a mortgage. But if it be found by ascertaining the intentions of the parties that it was originally an absolute or conditional sale, it must be so held, if in that form. "The intention of the parties is the only true and infallible test, and this intention is to be gathered from the circumstances attending the transaction and the conduct of the parties as well as from the face of the written contract." Jones on Mor. 258.

"If upon the whole investigation, it shall appear that a security for money was intended, it is a mortgage whatever be its terms; * * * * and, if on the other hand, it shall, upon the whole, appear that it was a conditional sale, the performance of the condition punctually at the time cannot be dispensed with." 2 Minors Ins. 329.

"In questions whether a deed is to be considered as a mortgage or an absolute purchase, a court of equity governs itself by the intention of the parties." *Thompson* v. *Davenport,* 1 Wash. 125.

"Under circumstances, a bill of sale, though absolute on its face, will be decreed a mortgage; the true question always being whether a purchase of the property or a loan of money or forbearance of a debt was intended." *Dabney et als. Exrs. & Legatees of Sadler* v. *Green,* 4 H. & M. 101.

"Though a deed be absolute on its face, the real nature of the transaction can be proven by parol evidence or the surrounding circumstances, and the deed be held to be a mortgage." *Lawrence* v. *DuBois,* 16 W. Va. 443, (syl. pt. 1). In the opinion in this case, JUDGE GREEN says, page 459: "Such an absolute sale (meaning the deed) may be converted into a conditional sale or a mortgage by proving that the real intention of the parties was that it should not be an absolute sale, and that such intention may be proven by the surrounding circumstances and by parol proof." And this he says is perfectly well settled almost everywhere, and especially in West Virginia.

"In considering whether or not a deed, absolute on its face is in fact a mortgage, the court seeks to ascertain the original and true intentions of the parties to the instrument by means of some well recognized rules and principles applying in such cases; and, while these rules are not *criteria,* determining the judgment of

the court in all cases, they are given great weight in concluding the question to be decided." Hogg's Eq. Prin. 715.

In *Davis, Com.* v. *Demming et al.,* 12 W. Va. 246, it is held that the following circumstances have great weight in determining that an absolute deed is in reality a mortgage: "First, if the alleged price given for the property is grossly inadequate; secondly, if the vendor remains in possession. of the property; and lastly, that there were, or had been, when the deed was executed, negotiations pending for a loan." In this case it is also held that to the end that the transaction may be decreed a mortgage, the relation of debtor and creditor must always exist.

Syllabus point 2, *Lawrence et al.* v. *Dubois et al.,* 16 W. Va. 443, reads as follows: "The following circumstances have great weight in determining that a deed absolute on its face is a mortgage: *First,* where the parties admit that the grantor owes, after the execution of the deed, the consideration of the land to the grantee as a debt. *Second,* if this alleged consideration is grossly inadequate. *Third,* if the vendor remains in posssession of the land for many years without the payment of any rent." The rules respecting the existence of a debt after the execution of the deed, and the grantor remaining in possession are reiterated in *Hoffman* v. *Ryan,* 21 W. Va. 415. In *Vangilder* v. *Hoffman,* 22 W. Va. 1, the following additional facts are held to be entitled to great weight in determining a deed absolute on its face to be a mortgage: "*First,* that the grantor was hard pressed for money and that the grantee was a known money lender; *second,* that the actual execution of the deed was preceded by a negotiation for a loan of money by the grantee to the grantor; *third,* that the parties did not apparently consider or contemplate the quantity or value of the land." These facts and circumstances are almost universally held to be *indicia* of a mortgage in the form of an absolute or conditional conveyance; but it is found in some cases that a single dominant fact, indicating a contrary intention, has been held to preponderate over practically all of them combined, as in the case of *Mathews* v. *Sanford,* 26 W. Va. 386; and, in seeking the intention of the parties at the inception of the transaction, the existence of any or all of these facts by no means sets a limit upon the investigation to be made. It is proper and right to consider the parol declarations of the parties, and the evidence of other witnesses, together with the situation and circumstances of the parties and their conduct prior to, at the time

of, or after the execution of the deed. *Vangilder* v. *Hoffman, supra; Snavely* v. *Pickle,* 29 Grat. 27.

There is one circumstance which, if found to exist in transactions of this kind, determines the question absolutely, namely, if after the deed is executed no debt remains due from the grantor to the grantee, the instrument is not a mortgage. In *Davis* v. *Demming, supra,* this Court held: "The distinction between a mortgage and a conditional sale is that where money is not loaned but is advanced with an agreement that if it be repaid at a given time, the vendee will re-convey the land, and the whole transaction shows clearly that no debt really remained after the execution of the deed, such transaction is a conditional sale." "The existence of a debt is the test. If an absolute conveyance be made and accepted in payment of an existing debt, and not merely as security for it, an agreement by the grantee to re-convey the land to the grantor upon receiving a certain sum within a specified time, does not create a mortgage but a conditional sale, and the grantee holds the premises subject only to the right of the grantor to demand a re-conveyance according to the terms of the agreement." Jones on Mor. s. 265, citing numerous authorities.

"Where there is no debt and no loan, it is impossible to say that an agreement to re-sell will change an absolute deed into a mortgage." *Glover* v. *Payne,* 19 Wend. (N. Y.) 518. "It is therefore a necessary ingredient in a mortgage that the mortgagee should have a remedy against the person of the debtor." C. J. Marshall in *Conway* v. *Alexander,* 7 Cranch 218.

If the transaction is found to have been a mortgage in its inception, the maxim, "Once a mortgage, always a mortgage," applies, and it remains a mortgage unless upon an adequate consideration the grantor afterwards conveys his equity of redemption, and such later transaction must be so reasonable and fair as to relieve it of any suspicion of unconscientious advantage taken by the mortgagee. But this rule is no more firmly established than that if the instrument is found not to have been a mortgage in the begining but a sale with a right to repurchase at the option of the grantor, it remains a conditional sale, and no subsequent event, short of a new agreement between the parties can convert it into a mortgage. Jones on Mor. 263.

The grantor is not at liberty to treat the instrument as a mortgage or a sale as may be convenient or desirable to him: to say,

in case the property depreciates in value to less than his debt, it is a conditional sale, and the grantor shall retain it; and, if it increase in value far beyond the debt, it is a mortgage, and shall be re-conveyed upon payment of the amount due. Nor can it be said that the policy of the law is opposed to conditional sales. "To deny the power of two individuals capable of acting for themselves to make a contract for the purchase and sale of lands, defeasible by the payment of money at a future day, or, in other words, to make a sale with a reservation to the vendor of a right to repurchase the same land at a fixed price and at a specified time, would be to transfer to the courts of chancery in a considerable degree, the guardianship of adults as well as infants. Such contracts are certainly not prohibited either by the letter or the policy of the law." Chief Justice Marshall in *Conway* v. *Alexander, supra.*

As to the character and amount of proof required to determine that a deed absolute on its face is in fact a mortgage, this Court has held that if the proof offered consists only of the parol declarations of the parties it must be clear and strong. So strict is this requirement indeed that I have been unable to find any case in which the proof did not go to the extent at least of an admission on the part of the grantee that the money represented in the transaction was a loan, coupled in each case with one or more of the circumstances which have been judicially determined to be *indicia* of the real contract having been a loan, or farudulent conduct on the part of the grantee. In *Klinck* v. *Price,* 4 W. Va. 4, it was shown that the grantee had been the agent of the grantor, knew he was financially embarrassed, made false and fraudulent representations to him, and had stated after the execution of the deed that he had loaned money to Price and had been deeded lands in Virginia in security for payment. In *Davis, Com.* v. *Demming, supra,* the land was worth far more than the alleged purchase price, the grantor was a very weak-minded man, the grantee in the first deed had told a third person after the execution of the deed that he had loaned, or let the grantor have money; the second grantee whose deed was the one directly in controversy had told one witness he would loan W. money at such a rate of interest he would never get his lands back, and shortly after the loan was made, told the same witness he had let him have money on short time so he could not redeem, and told another witness he had loaned W. money. In *Lawrence* v. *DuBois,*

*supra*, it was shown by declarations of the agent of the grantee who transacted the business for him and by the testimony of the magistrate who wrote the deed that it was for money the grantor owed the grantee and was intended only as a security for the money; and it was shown that, by the grantee's receipt signed by his agent, a payment on the debt had been accepted after the execution of the deed. It also appeared that the consideration was only fifty dollars and the value of the land three hundred dollars or four hundred dollars, and the grantor had remained in possession many years paying no rent.

In *Hoffman* v. *Ryan*, 21 W. Va. 415, a writing executed by the parties at the same time with the deed, showed on its face that the old debt due from the grantor to the grantee remained due after the execution of the deed, and provided that the grantor might within a specified time sell the land and pay back the consideration mentioned in the deed, and the two papers, read together, undoubtedly amounted to a mortgage of themselves unaided by parol evidence.

In *Vangilder* v. *Hoffman*, *supra*, there was parol evidence by strangers to the transaction of negotiations for a loan having preceded the execution of the writing. One of them had been sent to the grantor with an offer of the loan; one of them was a witness to an express agreement for the loan; the grantee admitted in his testimony that he had been applied to for the loan several times; he was a money lender; the grantor remained in possession of the land and the alleged consideration was not more than half the value of the land. In *Snavely* v. *Pickle*, 29 Grat. 27, proof was furnished of the existence of an express parol agreement by all the parties to the deeds in question, made before the execution of the instruments and unequivocally recognized afterwards that the conveyances were mere securities for a debt.

In *Russell* v. *Southard*, 12 How. 139, there was proof of preceding negotiations for a loan and an admission by the grantee that he had advanced between four thousand dollars and five thousand dollars on the place, but in case he owned the place, it would cost him ten thousand dollars. This, taken in connection with other testimony that the transaction was a loan and not a sale, and the fact that the alleged consideration was less than half the value of the land, proved that the real transaction was a loan of money, and the deed, therefore, a mere security.

In the case at bar there is no proof or evidence by any disin-

terested party that Sadler ever at any time uttered a word that did not consist with the terms of the written instrument containing the original contract. He denies that any loan was applied for and insists, on the contrary, that he was solicited by Taylor to take an interest in his coal lands and join him in his speculation. Taylor denies this and insists that he applied for a loan. Flavelle, then closely allied in interest with Sadler, and probably in his full confidence, but now as closely allied with Taylor and his heavy creditor, holding a deed of trust for a large amount on Taylor's property over which Sadler's claim has priority, does not pretend to give an utterance of Sadler's, showing an intention at any time contrary to the terms of the contract of October 25, 1892. He was not present when the basis of the agreement was settled between Sadler and Taylor. The latter says that after they had agreed, they went over and "acquainted" Flavelle with what had been done. Sadler says they talked it over with Flavelle after they had agreed. Flavelle says after they came back to the mill, he and Sadler hesitated whether they ought to give Taylor anything or not, finally deciding to risk the four hundred dollars, and advance the balance on the terms stated; that "we were practically to get ten thousand dollars for three thousand dollars." This last phrase is clearly only his present interpretation of the matter, for the terms stated as explained by all of them, contemplated as a condition precedent to the advance of the balance, the satisfactory result of a visit by Mr. Sadler to Mingo County to inspect the land. To get ten thousand dollars for three thousand dollars. How? From Taylor or out of the land? From Taylor's interest in the land, by him held, owned and paid for, or by virtue of the interests they were to acquire by joining in the enterprise and relying on the probability of a great increase in the value of the property, risking their money upon that possibility? Does not the hope or expectation of receiving back an increased amount lie at the foundation of every investment as well as of every loan, and is not this attributable to selfishness, or in the language of the witness, greed? The defendant rests his case largely upon Flavelle's testimony and attaches particular importance to his statements that Taylor was to transfer half the property to them as collateral security; that Taylor gave them to understand from the start that he had no intention of parting with his land; that "we lent him four hundred dollars with the understanding that he was to get two thou-

sand six hundred dollars after. Of course that was coupled with a consideration;" That "I decidedly understood it all through as a loan and treated it as such;" That "it was treated simply and purely from the start that we were to give three thousand dollars and receive ten thousand dollars. Mr. Taylor from the very starting point assured us that he did not wish to dispose of the land, and that this was purely collateral security." That being asked if he was a money lender he replied, "No, it was a clear case of catching a whale by throwing out a sprat, practically a speculation—greed on our part;" that it was the understanding that if they did not elect to go on with the transaction after Sadler's inspection of the land, it would be the security for the four hundred dollars and if they did elect to go on, it would constitute the security for the whole three thousand dollars; that he decidedly understood from the very first that it was in the nature of a loan, and he had no desire or expectation of getting one-half of the property; and that he was exceedingly anxious to get his money out of it, and saw no reasonable prospect of getting the full amount without throwing Taylor out in the street, selling him out root and branch, and had therefore relinquished his claim to his share of the profit in the ten thousand dollar agreement and taken a less amount. Plaintiff also relies on parts of the testimony of defendant's witness Flavelle, directing particular attention to his statements that the repurchasing clause was inserted at Taylor's instance; that Taylor could repurchase or not; that he had an option of throwing one-half of the property on their hands if he failed to exercise his right to repurchase; that they were to get ten thousand dollars or take half the land; that if Taylor did not want to pay the ten thousand dollars they were to keep half the land; that if Taylor wanted to let them keep half the land they could not have made him pay the money; that he never heard Taylor use the word "security" in speaking of the two thousand six hundred dollars; that he entered into the contract with the understanding that by putting in three thousand dollars they would get either ten thousand dollars or the share of the land; and that it was his distinct understanding that in case Taylor decided not to repurchase, he and Sadler owned half the land. The intelligence and business sagacity of Mr. Flavelle are manifest from his language and readiness as a witness, and in view of this, his testimony is most unsatisfactory. If the understandings to which he testifies are based upon the conversa-

tions had between the parties at the time the agreement of October 25, 1892, was executed, upon which this whole controversy depends, he ought to have been able to state some of the declarations then made, embodying the intentions of the parties, and his failure to give any of the language used on that occasion detracts very much from the weight to which his conclusions and understandings might otherwise be entitled. What he says is just as applicable to a contemporaneous or subsequent equitable interpretation of the transaction placed upon it by him alone, and not participated in by Sadler, as it is to the conversation had among them. How are we to tell upon which he bases it? He says he understood it all the way through as being in the nature of a loan and yet he dealt with the matter jointly with Sadler, representing him for years, and fails to name a time or place in which Sadler admitted that the transaction was different in its nature from what it appeared to be on the face of instrument, or to say that such an admission was ever even intimated by Sadler. In addition to all this, he says the word "security" was not used in the conversation which lies at the foundation of this instrument, and still insists that they took the land as collateral security.

Understanding that the three thousand dollars was a loan and not the purchase money of land, he says they could not collect it because Taylor had the option of compelling them to keep the land instead of collecting the money. If that be true, the transaction was surely a sale and not a mortgage. If, as he says, the advance of three thousand dollars was "coupled with a consideration" and that consideration was the placing of the title to the land in Sadler and Flavelle's hands with the understanding that it might remain there if Taylor should not elect to the contrary by exercising his option to repurchase and no indebtedness from him to them on account thereof existed in the meantime, it was a conditional sale, so determined by the application of that test which is admitted by all courts and text writers to be the best, and is laid down by this Court as the fact which always distinguishes a conditional sale from a mortgage. *Davis* v. *Demming, supra.*

Flavelle's testimony is not free from self-contradiction and inconsistency in other respects. He says in view of future knowledge, three thousand dollars was not an adequate price for the land. Then he says he was exceedingly anxious to get his money out of it and had no reasonable prospect of getting the full

amount unless he threw Taylor out into the street. He alleges in his answer that on August 31, 1898, he settled with Taylor and accepted as his half of the advancements made four thousand one hundred and forty-one dollars and eighty-five cents with six per cent. interest and testifies to having settled on the basis of one-half the money actually advanced by him and Sadler at seven per cent. It appears from Taylor's testimony that the four thousand one hundred and forty-one dollars and eighty-five cents has not been paid, and that Flavelle holds a deed of trust upon practically all of Taylor's estate in Mingo County, (including that upon which Sadler's debt is secured), dated August 31, 1898, to secure the payment of eleven thousand five hundred and thirty dollars and seventeen cents evidenced by Taylor's promissory note bearing even date therewith. Said deed recites that a portion of said eleven thousand five hundred and thirty dollars and seventeen cents is secured to Flavelle by the contract dated January 23, 1895, and does not state how much. It is also agreed in said deed of trust of August 31, 1898, that it shall only afford Flavelle a further and better security for the money justly due him under and by virtue of the said instrument of January 23, 1895. It strikes me as being strange that the anxiety of Mr. Flavelle to get his four thousand one hundred and forty-one dollars and eighty-five cents out of Taylor so operated as to induce him not only to permit it to remain there but to add more than seven thousand dollars to it. The absence of information as to when and how this increase occurred is also suggestive, to say the least. The agreement that said last mentioned deed of trust is only a further and better security for the money due Flavelle under and by virtue of the instrument of writing of January 23, 1895, without an intimation therein that that sum is one cent less than the amount therein named, is by no means calculated to resolve the ambiguities and inconsistencies of Flavelle's testimony in favor of an agreement different from that embodied in the terms of the contract of October 25, 1892. Nor does this last written evidence of his conduct, relating to the original transaction, taken in connection with the contracts of October 16, 1893, November 6, 1893, and January 23, 1895, in all of which he was interested, all of which harmonize with the statement that neither he nor Taylor has treated the transaction of October 25, 1892, as a loan, or anything different from what the contract shows on its face, at all times or at any time. The severance of his busi-

ness relations with Sadler, the increase of his investments with Taylor in these coal lands as well as of Taylor's indebtedness to him, and his holding a lien on Taylor's property, subsequent to that of Sadler's, by reason of which any scaling down of Sadler's claim would inure to his benefit, added to the vagueness and inconsistency of his testimony, do not give it the strength and clearness that should characterize parol evidence offered to prove that a deed absolute or conditional on its face, is in fact a mortgage. Taylor only undertakes to say what transpired between him and Sadler at the house of the latter, and in Flavelle's absence, and the substance of this is denied by Sadler. Thos. Stewart prepared the instrument of October 25, 1892, at the instance of all three of the parties thereto, from the following memorandum, prepared by him on their stating to him the terms of their agreement:

"Charles B. Taylor and Thomas Sadler and J. D. Flavelle. Three thousand dollars, four hundred dollars down and balance as payments become due on the Vance property. Taylor agrees to seel to S. & F. one-half all his interest in all properties; S. & F. elect on or before 1st January whether or not they will take property and if they elect not to take it, Taylor shall refund four hundred dollars with interest at seven per cent. If the profits or proceeds of property are not sufficient to pay balance purchase money when three thousand dollars is exhausted S. & F. will advance it as required to amount not exceeding two thousand dollars. Taylor to pay interest on excess of three thousand dollars at seven from time the respective advances are made. Taylor to have privilege to purchase back at any time within two years from this date at ten thousand dollars to be paid within five years from this date with interest at seven from October, 1894. Taylor to be bound to pay all in excess of one thousand two hundred dollars a year."

And he says that neither at that time, nor any other time, nor at the date of the settlement, made by him for Sadler and Flavelle with Taylor, they all being present, was a word uttered to him or in his presence by any of them importing any secret agreement or intention different from that incorporated into the written contracts prepared by him under their instructions. Nor did Taylor ever protest in his presence against the insertion of any of the terms expressed in any of the contracts.

Now, this parol evidence being insufficient, in my opinion, to

sustain the position of the defendant, is it aided by the facts relating to the situation of the parties at the time, and their conduct before and after the execution of the contract of October 25, 1892? Taylor was laboring under financial stress, and needed money, but neither Sadler nor Flavelle had been money lenders prior to that time. It may be doubted whether three thousand dollars was an inadequate price at that time for an undivided half of Taylor's interest in these lands, for he admits that all he had paid and agreed to pay for and on account of this interest, including improvements, did not exceed the sum of five thousand dollars, and certain it is that it was not more than six thousand dollars. His holdings were purely speculative, and in a very uncertain condition, as shown in the statement of this case. He had previously opened up his interest in the Cox land, and taken Hall into it on a basis similar to that upon which it appears he entered upon this transaction with Sadler and Flavelle, in view of which it is not at all unreasonable to suppose that his application to Sadler was not for a loan only but to dispose of a part of his holdings. It appears from the contract, then made, that even after shifting one-half of his speculative holdings to Sadler and Flavelle he was still unable to carry the balance of them upon his own resources. Sadler and Flavelle having taken half the land at three thousand dollars, and Taylor having paid not over one thousand seven hundred dollars all told, upon the other half, was relying upon his share of the future possible royalties from the coal to pay the balance, protected by an agreement on the part of Sadler and Flavelle, to advance him another one thousand dollars as a loan for that purpose, in case the royalties should prove to be insufficient. The royalties did so prove, and they loaned him not only the one thousand dollars but two thousand eight hundred and eighty-seven dollars more, and in the contract made nearly a year later, agreed to make him further advances upon the faith of his share of the royalties. Then, on November 6, 1893, another contract was made, removing the Hatfield land from the operation of the contract of October 25, 1892, and dividing the ownership of it among Sadler, Flavelle and Taylor in a manner different from the division under said first contract, and providing for further advances to be made by Sadler and Flavelle to enable Taylor to carry his part of it.

When the lands were leased to the Thacker Coal and Coke Company these contracts provided for and distinguished between

the interests of Sadler and Flavelle in the royalties as part owners of the land under the contract of October 25, 1892, and the interests of Taylor as such part owner under the same contract, the real occupant of the land being neither Sadler and Flavelle nor Taylor, but the said lessee company. In all these contracts and their dealings and conduct under them, the parties carefully discriminated between their conveyances and the loans.

It cannot be said, under all the circumstances, that Taylor remained in the occupancy of the land after the execution of the contract of October 25, 1892, in that sense in which the courts regard such occupancy as a circumstance indicating an intention different from that imported by the terms of the contract. Being a tenant in common with Sadler and Flavelle under that contract, his mere occupancy of the land would not have been inconsistent with its terms, and if he did occupy it, he accounted during that occupancy, to Sadler and Flavelle for their share of the rents, issues and profits thereof.

Nor can it be said that regard was not had to the value and quantity of the land in entering into the contract of October 25, 1892, for it clearly appears that Taylor, upon that occasion, produced all his evidences of interest in them with plats and descriptions, showing the quantity of land and stated the thickness of the coal veins and prospects of development of the coal region in which it was located. And a provision was inserted in the contract for the purpose of enabling Sadler to go and satisfy himself that they were as represented by Taylor and worth the money he proposed to invest in them, before irrevocably binding himself as a purchaser.

Although doubtful cases have generally been decided to be mortgages, (*Conway* v. *Alexander, supra*), it is no less true that the parties having deliberately given the transaction the form of a sale, the burden is upon the grantor to show that it is a mortgage, and his allegations in that respect must be substantially proved. The defendant in this cause having failed in this, the decree of January 16, 1900, must be affirmed, with costs to the appellee.

*Affirmed.*