# CHARLESTON.

## H. F. FARLEY *v.* FRED FORSTER *et al.*

Submitted May 29, 1924.    Decided June 16, 1924.

1. MORTGAGES—*Burden to Prove That Deed Mortgage on Asserting Party; Oral Evidence to Prove Deed Mortgage Must be Clear, Positive, and Unquestionable.*

   The burden of proving that a deed absolute on its face was intended to be and is in fact a mortgage, rests upon him who asserts it; and if oral evidence is relied upon it must be clear, positive and unquestionable.    (p. 653).

2. SAME—*Rule Stated for Ascertaining Whether Parties Intended Deed Absolute on Face to be Mortgage.*

   In determining the intention of the parties as to whether a deed is absolute, or is a mortgage or trust, the situation of the parties, their conduct and declarations respecting the transaction, and the circumstances may be considered. (p. 653).

3. SAME—*Facts Stated Constituting Deed, Alleged to be Mortgage, Conditional Sale.*

   If the relation of creditor and debtor between the grantor and grantee does not exist, and the deed is made with the agreement that if the consideration be repaid within a stated time, the vendee will reconvey the land, and the whole transaction shows that no debt remained after the execution of the deed, the transaction is a conditional sale.    (p. 653).

4. APPEAL AND ERROR—*Decision on Conflicting Oral Evidence Not Disturbed Unless Clearly Wrong.*

   The decision of a trial court upon conflicting oral testimony will be given due weight by the appellate court, and will not be disturbed, unless clearly wrong. (p. 659).

   MILLER, JUDGE, absent.

Appeal from Circuit Court, Mercer County.

Suit by H. F. Farley against Fred Forster and others. From a decree for defendants, plaintiff appeals.

*Affirmed.*

*James S. Kahle,* for appellant.
*John R. Pendleton,* for appellees.

LIVELY, JUDGE:

The question presented by this appeal is whether a deed dated the 26th day of October, 1922, from C. R. McNutt to Fred Forster, conveying about 22 acres in Mercer county, is in fact a mortgage to secure payment of a debt claimed to be owing by H. F. Farley to Forster; or whether the deed is an absolute one with a limited time allowed to Farley in which to purchase it from Forster by paying to him the purchase price paid by the latter to McNutt. The lower court decreed the deed to be an absolute one, denied relief to Farley and dismissed his bill.

The law applicable is well defined. If the purpose and intention of the parties when the transaction was completed was that the money advanced or paid by Forster to McNutt for the land was a loan to Farley and the relation of creditor and debtor was thereby created, and the title to the land held by Forster to secure payment of the debt, then the deed is in fact a mortgage; and "once a mortgage, always a mortgage." *Sadler* v. *Taylor,* 49 W. Va. 104; *Lawrence* v. *DuBois,* 16 W. Va. 443; *Vangilder* v. *Hoffman,* 22 W. Va. 1; *York* v. *Meek,* 91 W. Va. 106. Many of our other cases are of like import. On the other hand, it is well settled that if the money is not loaned, and the relation of creditor and debtor does not exist, the money advanced with agreement that if it be repaid at a given time the holder of the legal title will convey the land, the transaction is a conditional sale, an option to repurchase is given, and the land is held in fee subject to the right of the grantor to pay within the time of the option, and demand conveyance of the title. *Sadler* v. *Taylor,* 49 W. Va. 104; *Gibson* v. *Hopkins,* 80 W. Va. 756; *Davis* v. *Demming,* 12 W. Va. 246. Whether a conveyance is a conditional sale and purchase with option to repurchase; or whether it is in fact a mortgage to secure the payment of a debt, depends upon the intention of the parties to be ascertained by the writing or writings executed, the s i t u a t i o n of the parties and the facts and circumstances as shown by parol testimony. The rules for determining the intention of the parties are reasonably well defined. The burden of proving that a deed ab-

solute on its face is in fact a mortgage rests upon him who asserts it to be a mortgage; and where parol testimony is relied upon it must be clear, positive, and unquestionable; and generally conflicting oral testimony is not sufficient. *Fridley* v. *Somerville*, 60 W. Va. 272; *Way* v. *Mayhugh*, 57 W. Va. 175; *Hudkins* v. *Crim*, 64 W. Va. 225; *Troll* v. *Carter*, 15 W. Va. 567. Parol evidence by which it is sought to vary the terms or meaning of a solemn deed is of the weakest character and should be considered with the greatest caution; and unless corroborative of other proof, and aided or confirmed by surrounding circumstances, it will be insufficient. Manifestly the solution of the controlling question presented by this record depends upon the facts. What are they?

In 1916 plaintiff H. F. Farley owned a considerable tract of land near the city of Princeton, through which the Athens-Princeton county road ran. Becoming heavily indebted, a creditors' suit was instituted against him and the entire land was sold under decree and purchased by DeJarnette, who represented the Princeton Banking Company, one of the large lien creditors, and deed made to him by special commissioner on December 16, 1916. Later, the Banking Company directed DeJarnette to convey the land to Downey and Calfee, trustees, with power to rent, sell and otherwise deal with the land, and pay off a note held by it against Farley for about $14,000; and if any money remained after paying off the note, then the remainder should be turned over to Farley, or if any land remained they should deed it to Farley, or perhaps to his daughter. The trustees took possession, put Farley on the land, who remained in possession while the land was sold off in various parcels and now remains in possession of the remainder, the 22 acres in controversy. The rents and proceeds of sales were turned over to the Banking Company until the amount of the note remaining was about $6,000, when they were directed to close up the matter by selling the remainder of the land. Farley and Chambers, a real estate agent, had been assisting the trustees in disposing of the land. Fearing that there would be nothing left for himself or daughter, if the matter was thus closed up, Farley approached McNutt in order to get him to take the remaining land over, and give him a chance to redeem. McNutt did so,

proposing in writing, (accepted by Farley and Chambers), to take a deed to the land, pay off the bank debt remaining, and give Farley and Chambers four months in which to repay him, including about $700 owing to himself by Farley and about $1,000 which Farley owed to the First National Bank of Princeton. The time limit for repayment was four months from January 4, 1922. The land at that time had been reduced to about 140 acres. This land was to be sold, and if a balance was left after paying these debts; including commissions of the real estate agent Chambers, it was to be paid over to Farley. The deed from the trustees to McNutt was executed on January 5, 1922, and is absolute on its face. The four months having expired, or about to expire, there remaining the 22 acres in controversy not disposed of and converted into cash or good securities, and there remaining unpaid to McNutt the sum of $3,500, he notified Farley and Chambers that he would sell the remaining 22 acres 'on which was located the dwelling house and an orchard, at 11 o'clock A. M., May 31, 1922, for which sale he had a written offer from a responsible person, at the price of $3,500. Farley then began his efforts to get some one to purchase the property and give him further time to redeem. Through Mrs. Catron, a school mistress who was living at his house and whom he afterwards married, he learned that defendant Fred A. Forster, a teacher in the college at Athens, about seven miles distant from Princeton, had accumulated some ready money, and he was approached for that purpose and appealed to by Farley to take over the property, who told him that he could readily get sufficient money by borrowing on the property to make the deferred payments, saying that $500 down was all that was needed. Forster expected to take his vacation in October and contemplated being away a considerable time and would then have use for his money. On the day McNutt had set for sale of the property to another at $3,500, Forster, at the solicitation of Farley and Chambers, went to McNutt's office before 11 o'clock A. M., when it appeared that McNutt required a down payment of $1,500, which was about all the ready money Forster had. He says he refused to buy but was assured by Farley that he, Farley, would be able to raise the money sufficient to redeem the property from Goodall,

Farley's nephew who was disposing of his farm in Summers county, and who was coming to live with Farley and work in the shops at Princeton. Just before the hour of 11 o'clock Forster, at Farley's urgent request, paid to McNutt $1,500 and bought the property, executing three notes for the deferred payments in equal installments at one, two and three years, with interest, the notes being dated January 5, 1922, the date of the deed to McNutt from the trustees. Two hundred dollars of the down payment was paid to Chambers as commissions on sales made by him of a portion of the land prior to that date. McNutt knew of no understanding between Farley and Forster concerning the land. As to this transaction, Farley's contention and testimony is that at that time in the office of McNutt he and Forster agreed that the latter should purchase the property from McNutt and that Farley should have until the first of April, 1923, in which to repay the amount expended; that they would secure a loan on the property of $2,500 out of which Forster would repay himself $500 as partial reimbursement of the $1,500 down payment; $2,000 applied to the discharge of the McNutt notes aggregating $2,000 (excluding interest) ; and the $1,000 which remained to Forster was to be repaid by Farley by payment of $800 by April 1, 1923; and the balance of $200, closed by a note with good security. Just how the contemplated loan was to be repaid, and by whom and how Forster was to be relieved from his liability thereon, does not appear. Forster says he bought the property unconditionally from McNutt, and gave Farley until the 1st of September following the right to redeem the land by taking it over and releasing him from any liability thereon. He left Farley in possession of the property with the understanding that the house should be painted and repaired by Farley, so that if he had to sell it, a better price might be obtained. The painting and repairing was not done. It appears that Farley had expected money from Goodall who failed to sell his land in Summers county. In July he and Mrs. Catron called on Forster, and it was suggested that Mrs. Catron's salary as a teacher, $100 per month, be applied on the redemption of the land during the winter months. Farley and Mrs. Catron say the former was stating the agreement or contract which had been agreed

upon on May 31st at the time of the purchase from McNutt. Forster denies that this conversation between him, Mrs. Catron and Farley was a statement of the contract; he says they called upon him and in effect advised him that Mrs. Catron had agreed to assist in redeeming the land with the aid of her salary as a teacher, but that he did not assent thereto. It will be observed that this conversation was a month or so after the purchase. As evidencing the contention of Farley and that Forster was to be repaid partially by securing a loan on the property there was evidence that tentative negotiations looking to that end were carried on between Forster and Hartley Sanders who represented a loan company, it having been suggested by Farley that a loan could be obtained in that way. The company represented by Sanders would not loan on less than 25 acres, and the acreage of the lot in dispute only containing 22 acres Farley attempted to secure three acres off of an adjoining portion of the original tract which had been sold to Keaton, relieving Keaton of his proportionate amount of the purchase money on his purchase, and transferring it to Forster's tract, contemplating that Forster would pay for the three acres and include that in the acreage for the loan from Sanders. Forster did not desire to go deeper in debt and would not pay for the additional acreage, and being able to pay the notes, the first of which became due the following January, by his own means and through the promised assistance of the Bank of Athens, the tentative negotiations for a loan from Sanders engineered by Farley, ceased. As above stated, Farley failed to get the money from his nephew Goodall; and apparently made no further effort to redeem his land. After the first of September, the expiration of the time which Forster contends he had agreed to give for the redemption of the land, he notified Farley that he was negotiating with Young, and perhaps another, who had approached him for the purpose, with a view of disposing of the land, and of being relieved from the payment of the balance of the purchase money, the first payment on which would be due in January following. Young says that in a conversation with Farley about the matter, he, Farley, told him that he had only until the first of September to redeem the land from Forster. This is denied by Farley.

On October 12, 1922, Forster sold the tract in controversy to defendant Joel H. Young, for the sum of $4,000, $800 of · which he paid to Forster in cash and assumed the payment of the balance represented by the purchase money notes to McNutt. This suit promptly followed to prevent the consummation of that sale and the delivery of the deed from Forster to Young; to require McNutt (who had not yet executed his deed to Forster) to deed the same to Forster, and that the deed when so executed to Forster be declared a mortgage to secure the payment of a debt from Farley to Forster; and require Forster to carry out the provisions of his alleged contract. Testimony was taken to sustain an allegation of the bill that the 22 acres was worth more than $3,500 or $4,000, as indicating that the parties intended the purchase by Forster from McNutt to be in the nature of a trust. This evidence shows that the fair and reasonable value of the land would not exceed $4,000. Some of the witnesses fix its value at à less sum than that. It is significant that McNutt had found a purchaser at $3,500, and that he afterwards sold for that price to Forster. It is also significant that both before and after the sale Chambers and Farley could not obtain a purchaser who would pay a greater sum. The best of this land sold for $50 an acre; another part of perhaps equal value at $40 an acre, and the house on the 22 acres was about twenty years old, erected at an expense of $2,600, and the fences and orchard had been allowed to deteriorate. We think the allegation of inadequacy of price paid is not sufficiently established. So much for the facts.

There are certain rules by which the intention of the parties may be ascertained when a deed absolute on its face is asserted to be a mortgage. One of the first rules is that peculiar weight must be given to the admissions of the parties that after the execution of the deed, the grantor (in this case Farley standing in that relation), owed the amount paid for the land to the grantee as a debt. There is no such admission in this case. Forster did not claim the $1,500 he had paid as a debt owing to him by Farley. No note or other evidence of indebtedness was exchanged between them. The parties speak of a chance to redeem the land given to Farley. Such was the arrangement between Farley and McNutt.

Farley claims that he had the right to repay to Forster $800 of the $1,500 paid by him by the first of April, 1923. No explanation is offered as to how Forster would be relieved from his obligation to McNutt for the balance of the purchase money. Even if a loan had been secured to discharge McNutt's notes for purchase money, still Forster having the legal title would be bound for the repayment of that loan. A second rule is that if there is a gross inadequacy of the consideration mentioned in the deed, that would indicate a trust. The evidence, as above stated, does not disclose inadequacy of consideration. The third rule is that if the grantor retains possession and control of the land after the making of the deed without payment of rent; this fact would indicate a trust and not an absolute sale. While it appears that Farley retained possession of the house and land, it was under the agreement, which he does not deny, that he was to paint the house and repair the fences and make it more attractive for the purpose of sale, if Forster had to sell. A fourth rule is that if there had been negotiations between the parties for a loan prior to the sale, this fact is peculiarly significant of a trust. There was no negotiations for a loan in this case; not the slightest evidence thereof. A fifth rule is that if the grantor was hard pressed for the money and the grantee was a known money lender, a *prima facie* presumption is raised that the latter took the title as security for a loan. While Farley was hard pressed for money and had been seemingly in that condition since 1916, and was making strenuous efforts to save something after the payment of his debts, there is no evidence that Forster was a money lender. On the contrary, it is shown that he was a teacher and that the money he had on hand was not for the purpose of making loans. The courts and text writers also say that if when the title was taken the parties did not apparently consider or contemplate the quantity or value of the land, this would indicate a loan instead of a purchase. There is nothing in this case under which this rule can be invoked. Both parties knew the quantity and value of the land, and Forster appears to have known its location, condition and approximate value.

Under the well settled law, and the rules above adverted

to for ascertainment of the intention of the parties (which is the guiding star in the interpretation of transactions of this character) we have come to the conclusion that the conflicting verbal evidence and the facts and circumstances surrounding the execution of the deed are not sufficient to overcome the presumption that the deed is what it purports to be on its face, an absolute conveyance of title, and not a mortgage. The title to the entire tract of land had passed from Farley by the judicial sale in 1916 and it was only by the grace of the banking company that he was given a chance to so handle the property for it through trustees that he might perhaps save something after the payment of his debt. He continued his exertions with that view when he interested McNutt in giving him and Chambers a further chance; it was with the same view that he induced Forster to purchase the land with his savings. There is a direct conflict between Forster and Farley as to their agreement at the time the deed was made from McNutt when Forster saved the land from passing entirely beyond any chance of redemption by Farley. On this conflicting oral evidence the circuit court has determined that the equity is with the defendant, and many of our decisions repeat the proposition that this court will give much weight to the finding of the lower court upon the consideration of conflicting oral evidence, and will not disturb the finding unless it is clearly erroneous. *Baughman* v. *Hoffman,* 90 W. Va. 388.

We affirm the decree.

*Affirmed.*