296 S.E.2d 909

**A. James MANCHIN, Secretary of State, etc.**

v.

**Chauncey H. BROWNING, Jr., Attorney General, etc.**

No. 15485.

Supreme Court of Appeals of West Virginia.

July 15, 1982.

Dissenting Opinion Sept. 16, 1982.

Neely, J., dissented and filed opinion.

782

Timothy N. Barber, Charleston, for petitioner.

Victor A. Barone, Deputy Atty. Gen., and S. Clark Woodroe, Asst. Atty. Gen., Charleston, for respondent.

McGRAW, Justice:

This case came to us upon a *pro se* petition for a writ of mandamus. The petitioner, A. James Manchin, Secretary of State of West Virginia, seeks to compel the respondent, Chauncey H. Browning, Jr., Attorney General of West Virginia, to provide agreeable legal representation from the Attorney General's office or to appoint a Special Assistant Attorney General to represent the petitioner in litigation in the federal courts. The issues raised by the petition concern the powers and duties of the Attorney General to represent state officials in civil actions. We find that the petitioner is entitled to be represented by the Attorney General in the federal litigation, and we award the writ.[1]

On December 11, 1981, a civil action was filed in the United States District Court for the Northern District of West Virginia against the petitioner, A. James Manchin, in his official capacity as Secretary of State. The plaintiff sought to have W.Va.

---

1. On April 1, 1982, more than a month after this case was argued, submitted and substantially decided, the respondents moved this Court "to dismiss because of mootness". They submitted what they purported to be final orders of the United States District Court for the Northern District of West Virginia in two cases, *Gingerbrook et al. v. A. James Manchin, Secretary of State of West Virginia*, Civil Action No. 81–0095–C, et al., and *Tom E. Moses v. Jay Rockefeller, Governor of West Virginia, and A. James Manchin, Secretary of State of West Virginia, in their official capacities*, Civil Action No. 82–2044. The respondents represented in their untimely motion to the Court that these cases had "been terminated and dismissed" by the federal court and that "there is thus no need nor even possibility of providing special representation for the secretary of state".

The respondents' motion, which was never argued, does not contemplate the contingency of appeal nor does it reflect a position of the Secretary of State thereon. The right to appeal is as elemental to due process as is the right to counsel and until the Secretary of State has made this determination we cannot consider this matter moot. Additionally, this case presents a substantial public policy issue which can constantly reoccur. For these reasons we deny the motion to dismiss as moot.

Code § 1–2–3 [1971],[2] providing for apportionment of congressional districts, declared unconstitutional and to have the petitioner enjoined from compelling candidates for Congress to run "at large."

After service of the complaint upon the Secretary of State, the matter was referred to the Attorney General, the respondent herein, for preparation of an answer. Over the petitioner's objections the respondent's answer denied that the existing apportionment, as provided by the statute, was unconstitutional and sought to compromise the suit by requesting time to have the Legislature, rather than the courts, remedy any defects there might be. The position taken by the Attorney General was inconsistent with that of the Secretary of State, who agreed with the plaintiff in the civil action that the existing apportionment statute was unconstitutional and that reapportionment should take place immediately. Due to this conflict between the parties to this action respecting the position of the defense in the federal litigation, the Secretary of State requested the Attorney General to appoint special counsel to represent him in the federal court. This request was refused and the Secretary of State subsequently filed the petition in the instant case.

The issue presented for our determination is whether the Attorney General is required by law to afford the Secretary of State legal representation in any civil action in which the Secretary is made a party defendant in his official capacity. The petitioner asserts that the respondent's refusal to provide him with legal representation in the federal court litigation denied him the right to counsel, due process of law and access to the courts as guaranteed by the state and federal constitutions. U.S. Const. amends. VI, XIV; W.Va.Const. art. 3, § 10; art. 3, § 17. The respondent contends, however, that his office is vested with the exclusive authority to manage and control litigation to which the state or its officers, in their official capacities, are made parties, that the petitioner is merely a nominal party to the litigation in question, the real party in interest being the Legislature, and that he, as Attorney General, is required to defend the constitutionality of the acts of that body.

As a threshold issue, we note that the respondent attributes the power of the Attorney General to control litigation on behalf of the state and its officers to the broad common law powers of the office. He asserts that the Attorney General is the chief law officer of the state and is charged with representing the public interest in any such litigation without interference from or the approval of any other official. In support of this proposition, the respondent relies on *State v. Ehrlick*, 65 W.Va. 700, 64 S.E. 935 (1909).

*Ehrlick* involved a dispute between a county prosecuting attorney and the Attorney General as to which officer was empowered to seek an injunction on behalf of the state to restrain illegal gambling activities. The Court found that power to reside in the Attorney General on the ground that the office of prosecuting attorney was of statutory creation and thus vested only with the powers conferred by the Legislature, while "[t]he office of Attorney General is of very ancient origin, and its duties and powers were recognized by the common law." 65 W.Va. at 702, 64 S.E. at 936. The Court held that the Attorney General possessed all the common law powers and duties of the office. *Ehrlick*, however, contained very little discussion of the history of the office of Attorney General or of the powers and duties reposed therein. Indeed, we find no in-depth analysis of the office of Attorney General as it exists today in the jurisprudence of this jurisdiction. We believe such an analysis is essential to our understanding of the source and nature of the powers of our Attorney General today.

The Court in *Ehrlick* was quite correct in its statement that the office of Attorney General is of ancient origin. The title first

---

**2.** This provision was amended by the Legislature and became effective January 28, 1982.

1982 Acts ch. 32.

appeared in England in 1461. The office developed from the medieval offices of King's Attorney and King's Serjeant. By 1570, the Attorney General, accepted by tradition to be a member of the bar, had become the chief legal adviser of the Crown. The office was vested with numerous powers and duties, including the management and control of the Crown's legal affairs and the prosecution of all suits in which the Crown was interested. The office was transported to the British colonies in North America and became the basis for the office of Attorney General in this country. L. Clay, *The Attorney General of West Virginia* (1957); D. Walker, *The Oxford Companion to Law* "Attorney-General" (1980). *See generally* 7 Am. Jur.2d *Attorney General* § 9 (1980); 7A C.J.S. *Attorney General* § 1 (1980).

As a consequence of the American Revolution, the executive powers of the Crown office of Attorney General underwent substantial modification in Virginia. The first constitution of Virginia, adopted June 29, 1776, recognized the Attorney General as a judicial officer, thereby removing him from the executive department. He was appointed by and served at the pleasure of the General Assembly and was commissioned by the Governor. In addition, the Attorney General was specifically prohibited from holding elected office in either the legislative or executive department. Va. Const. of 1776, § 14. This constitution continued in force until superseded by an amended constitution, submitted by the General Assembly on January 15, 1830. The provisions of the amended constitution relating to the office of Attorney General were altered little. The Attorney General remained an officer of the judicial department, was appointed and commissioned in the same manner and continued to serve at the pleasure of the General Assembly. Va. Const. of 1830, art. V, § 7.

The 1850 Virginia Constitution made some sweeping changes in the office. It provided for the first time for the election of the Attorney General by the voters of the Commonwealth and established a definite term of office. The Attorney General continued to serve as an officer of the judiciary, however, and the amended constitution provided "[h]e ... shall perform such duties and receive such compensation as may be prescribed by law, and be removable in the manner prescribed for the removal of judges." Va. Const. of 1850, art. VI, § 22.

The relevant portions of the 1850 Virginia Constitution were still in effect at the time of West Virginia's separation from the mother state.[3] The constitutional convention which met in Wheeling from November 26, 1861 to February 18, 1862, to frame the first Constitution of West Virginia borrowed heavily from the 1850 Virginia Constitution in providing for an Attorney General of West Virginia. He was designated an officer of the judiciary and it was provided: "At every regular election of a Governor, an Attorney General shall also be elected. He shall be commissioned by the Governor; shall perform such duties, and receive such compensation as may be prescribed by law, and be removable in the same manner as the Judges." W.Va. Const. of 1863, Art. VI, § 16. This constitution was approved by the voters on April 3, 1862, and went into effect on June 20, 1863, when West Virginia was admitted into the Union. It remained in effect until the adoption of our present constitution in 1872.

The provisions of our constitution today relating to the office of the Attorney General remain substantially the same as they were in 1872. Article 7, section 1 transferred the Attorney General back to the executive department and provides:

The executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture and attorney general, who shall be, ex officio, reporter of the court of appeals. Their terms of office shall be four years and shall commence on the first Monday after the second Wednesday of January next after their election. They shall re-

---

**3.** The Constitution of 1850 was amended on February 13, 1861, to reflect Virginia's transfer of allegiance from the Union to the Confederacy.

side at the seat of government during their terms of office, keep there the public records, books and papers pertaining to their respective offices and shall perform such duties as may be prescribed by law.

This section requires the Attorney General to perform certain specific duties, including service as the official reporter of this Court. *See* W.Va. Reports, Vols. 1–157 (1863–1974). However, most of the powers exercised and the duties performed by the Attorney General are not specified in the constitution. Rather, article 7, section 1 provides that the Attorney General "shall perform such duties as may be prescribed by law."

 The plain language of this constitutional provision, when viewed against the historical backdrop of the development of the office of Attorney General in the Virginias, leads us to conclude that the Attorney General of West Virginia does not possess the common law powers attendant to that office in England and in British North America during the colonial period. By removing the traditional executive office of Attorney General to the judicial department and establishing a tri-partite state government, with separate legislative, executive and judicial departments, the framers of the first Virginia Constitution in effect abrogated any common law executive powers the holder of that office may have had. The executive function formerly exercised by the Attorney General at common law was extinguished, and for the next 96 years he remained a minor judicial officer, prohibited by the separation of powers from wielding the common law legislative and executive powers traditional to the office in Great Britain.

 By the provisions of our present constitution, the Attorney General is once again an officer of the executive department. However, his return to the executive department did not revive the common law powers of the office. The people of West Virginia specifically expressed their intent that the Attorney General should not exercise those powers by providing that he "shall perform such duties as may be pre-

scribed by law." Under settled rules of construction, the word "shall" when used in constitutional provisions is ordinarily taken to have been used mandatorily, and the word "may" generally should be read as conferring both permission and power. *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953). The phrases "prescribed by law" and "provided by law" mean prescribed or provided by statutes. *Lawson v. Kanawha County Court*, 80 W.Va. 612, 92 S.E. 786 (1917). The plain effect of the provision is to limit the powers of the Attorney General to those conferred by law laid down pursuant to the constitution. Consequently we conclude that the powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto. We hereby overrule *State v. Ehrlick, supra,* insofar as it conflicts with this view.

The courts of other jurisdictions which have decided whether constitutional provisions similar to article 7, section 1 of our constitution vest the Attorney General with common law powers and duties have concluded as we. In *In Estate of Sharp*, 63 Wis.2d 254, 260–261, 217 N.W.2d 258, 262 (1974), the Wisconsin court stated:

Wisconsin, unlike numerous states, has specifically circumscribed the powers and duties of the office of Attorney General. Art. VI, Sec. 3 of the Wisconsin Constitution limits those powers and duties to those "prescribed by law." This constitutional principle has been interpreted by the courts in numerous decisions as removing from the office of the Attorney General any powers and duties which were found in that office under common law.

*Cited in State v. Wisconsin Telephone Co.*, 91 Wis.2d 702, 710, 284 N.W.2d 41, 44 (1979). *See also State ex rel. Reynolds v. Smith*, 19 Wis.2d 577, 120 N.W.2d 664 (1963). The Supreme Court of Arizona discussed this principle at length in *Shute v. Frohmiller*, 53 Ariz. 483, 90 P.2d 998 (1939).

If the constitution had created the office of attorney general without refer-

ring to its powers and duties, it might be true under the authorities that the term, "attorney general," had been used in its common-law acceptation, since Arizona is a state in which the common law prevails. A statement to this effect appears in *State v. Huston*, 21 Okl. 782, 97 P. 982, 992, wherein the court in a rather exhaustive opinion on rehearing said: "The correct rule appears to be that where the office of Attorney General is created in states where the common law prevails, without any reference to the duties of such office, the word is used with its accepted meaning under the common law, and carries with it such duties and powers as were usually incident to the office of Attorney General in England under the common law, when not locally inapplicable."

But when the constitution provides in the same article in which it creates the office of attorney general that that officer "shall perform such duties as are prescribed by this Constitution and as may be provided by law" and that his powers and duties "shall be as prescribed by law," it cannot be said that the constitution is silent as to his duties and powers. It is true that it does not itself enumerate them but in stating that they shall be "as prescribed by law" it refers to them and clearly makes it the duty of the legislature to say what they shall be. The expressions, "as provided by law," and "as prescribed by law," are, as we see it, susceptible of no other construction. The word "law" in both expressions means statute, *Fountain v. State*, 149 Ga. 519, 101 S.E. 294; *Exline v. Smith*, 5 Cal. 112; *Lawson v. Kanawha County Court*, 80 W.Va. 612, 92 S.E. 786; *Winters v. Hughes*, 3 Utah 443, 24 P. 759; *In re Campbell*, 138 Mich. 597, 101 N.W. 826; *People v. Santa Clara Lumber Co.*, 55 Misc. 507, 106 N.Y.S. 624. From this it follows necessarily, as most courts hold, that under constitutions containing provisions similar to those in Arizona, the attorney general is not a common-law officer, one upon whom "the duties and powers of the attorney general as the same *was* known in

common law" have been engrafted but is one whose powers and duties may be ascertained only by resort to the statutes. 53 Ariz. at 487–488, 90 P.2d at 1000–1001.

*See also Arizona State Land Department v. McFate*, 87 Ariz. 139, 348 P.2d 912 (1960). The same reasoning has compelled numerous jurisdictions to hold that the Attorney General has no common law powers and duties where the constitutional provision which creates the office makes no specific grant of powers other than requiring him to perform such duties as are "prescribed by law." *Railroad Tax Cases*, 136 F. 233 (E.D.Ark.1905); *State ex rel. Attorney General v. Reese*, 78 N.M. 241, 430 P.2d 399 (1967); *People v. Dorsey*, 176 Misc. 932, 29 N.Y.S.2d 637 (1941); *State v. Huston*, 21 Okl. 782, 97 P. 982 (1908); *State v. O'Connell*, 83 Wash.2d 797, 523 P.2d 872 (1974); *State ex rel. Winston v. Seattle Gas & Electric Co.*, 28 Wash. 488, 68 P. 946 (1902). *See also People ex rel. Deukmejian v. Brown*, 29 Cal.3d 150, 172 Cal.Rptr. 478, 624 P.2d 1206 (1981); *Padgett v. Williams*, 82 Idaho 28, 348 P.2d 944 (1960); *Garcia v. Laughlin*, 155 Tex. 261, 285 S.W.2d 191 (1956).

■ The Attorney General also asserts and argues that he is the "chief law officer of the state." By adding nuance, we agree with this proposition. The everyday meaning of the term "law officer" is one who is charged with enforcing the law, as a law enforcement agency or officer. *See* Webster's Third New International Dictionary, "Law" (1964). In this sense the Attorney General is not the chief law officer of the state. Article 7, section 5 of our constitution provides: "The chief executive power shall be vested in the governor, who shall take care that the laws be faithfully executed." This provision plainly mandates that the chief law officer of the state, in the sense of "law enforcement" officer, is the Governor. Legislative enactment bears this out, for the Governor is ultimately the commander of all law enforcement agencies of the state, including the Department of Public Safety, W.Va.Code § 15–2–1 *et seq.* (1979 Replacement Vol.); the military

forces of the state, W.Va. § 15–1–2 (1979 Replacement Vol.); inspectors of the Department of Labor, W.Va.Code § 21–1–1 *et seq.* (1981 Replacement Vol.); security officers of the Department of Finance and Administration, W.Va.Code § 6A–1–1 *et seq.* (1979 Replacement Vol.); conservation officers, W.Va.Code § 20–7–1 *et seq.* (1981 Replacement Vol.); the Public Service Commission, W.Va.Code § 24–3–1 *et seq.* (1980 Replacement Vol.); and the Department of Highways, W.Va.Code § 17–2A–1 *et seq.* (1974 Replacement Vol.).

■ The Attorney General is not a law enforcement officer in the same sense as the Governor. Nor has the Attorney General of West Virginia the same place in the law enforcement chain of command as does the Attorney General of the United States who, after the President, is the chief law enforcement officer of the federal system. A series of West Virginia cases clearly indicates that the traditional law enforcement function associated with the office of Attorney General in Great Britain, colonial British North America and the federal government of the United States, is exercised in West Virginia by the respective county prosecuting attorneys. *State ex rel. Matko v. Ziegler*, 154 W.Va. 872, 179 S.E.2d 735 (1971), *overruled on other grounds, Smoot v. Dingess*, 160 W.Va. 558, 236 S.E.2d 468 (1977); *Denham v. Robinson*, 72 W.Va. 243, 77 S.E. 970 (1913); *State v. Ehrlick, supra.*

■ In West Virginia, theAttorney General has no legislative mandate as a "law enforcement officer" and he holds no law enforcement powers different than or beyond the powers exercised by any other elected officer of the executive department with specialized duties serving under the leadership of the Governor on the Board of Public Works. Those officers perceiving offenses in their special areas of responsibility may move as prosecuting complainants and, with the assistance of the prosecuting attorney, prosecute in their official capacities such offenses as are within their special jurisdiction. In this context the Attorney General is more properly designated as the chief *legal* officer of the state, with

the law as his area of special expertise. The Attorney General, as a complement to the Governor, is the chief "law-trained" officer of the state. *See People ex rel. Deukmejian v. Brown, supra; State ex rel. Winston v. Seattle Gas & Electric Co., supra.* By the nature of his office, he is the general lawyer for the state, an office which he could not hold if he did not have the proper legal qualifications and were not admitted to the bar.

Having determined that the Attorney General exercises only those powers and duties prescribed by rules of law, we turn now to the question of whether he is required to provide legal counsel for the Secretary of State when that officer is sued in his official capacity. By statute the Attorney General is required to provide legal services to enumerated state agencies and officials, including the Secretary of State, upon request.

> The attorney general shall give his written opinion and advice upon questions of law, and shall prosecute and defend suits, actions, and other legal proceedings, and generally render and perform all other legal services, whenever required to do so, in writing, by the governor, the secretary of state .... W.Va.Code § 5–3–1 (1979 Replacement Vol.)

Furthermore, by the plain terms of this statute it is unlawful for the executive department of state government, the governor, the secretary of state, the auditor, the state superintendent of free schools, the treasurer, the commissioner of agriculture, the board of public works, the tax commissioner, the state archivist and historian, the commissioner of banking, the adjutant general, the chief of the department of mines, the superintendent of public safety, the state commissioner of public institutions, the state road commission, the workmen's compensation commissioner, the public service commission, or any other executive officer, board or commission, or the head of any state educational, correctional, penal, eleemosynary or other executive institution "to expend any public funds of the State of West Virginia, for the purpose of

paying any person, firm or corporation, for the performance of any legal services." [4]

In addition W.Va.Code § 5–3–2 (1979 Replacement Vol.) provides:

The attorney general shall appear as counsel for the State in all causes pending in the supreme court of appeals, or in any federal court, in which the State is interested; he shall appear in any cause in which the State is interested that is pending in any other court in the State, on the written request of the governor, and when such appearance is entered he shall take charge of and have control of such cause; *he shall defend all actions and proceedings against any state officer in his official capacity in any of the courts of this State or any of the federal courts when the State is not interested in such cause against such officer,* but should the State be interested against such officer, he shall appear for the State; he shall institute and prosecute all civil actions and proceedings in favor of or for the use of the State which may be necessary in the execution of the official duties of any state officer, board or commission on the written request of such officer, board or commission .... (Emphasis added.)

■ These provisions clearly designate the Attorney General as the legal advisor and representative of the Secretary of State and other state officers when they are sued in their official capacities. The Attorney General is required to give legal advice, to prosecute and defend suits and to appear in court on their behalf. It is equally clear that W.Va.Code § 5–3–2 requires the Attorney General to act as legal counsel and representative on behalf of the state. Indeed, explicit in the title Attorney General is the proposition that the holder of the title is the general lawyer for the state.[5] *See State ex rel. Dostert v. Riggleman,* 155 W.Va. 808, 187 S.E.2d 591 (1972); *State ex rel. Summerfield v. Maxwell,* 148 W.Va. 535, 135 S.E.2d 741 (1964). The respondent contends that the Attorney General's obligation to represent the interests of the state is paramount to his duty to defend state officers and that he has the power and the duty to take over the management and control of the litigation to further the interests of the state to the exclusion of the defendant state officer.

■ The Attorney General ordinarily exercises complete control of litigation conducted in his name. 7A C.J.S. *Attorney General* § 12 (1980). When the Attorney General appears in a proceeding on behalf of the state in his name, he exercises discretion as to the course and conduct of the litigation. He assumes the role of a litigant and he is entitled to represent what he

4. Some executive department agencies are specifically exempted from this provision by virtue of statutory authorization to hire their own counsel using agency funds. *See, e.g.,* W.Va. Code § 12–6–5(6) (1979 Replacement Vol.); (Board of Investments); § 16–26–6(12) (1979 Replacement Vol.) (West Virginia Resource Recovery—Solid Waste Disposal Authority); § 17–2A–7 (1974 Replacement Vol.) (Department of Highways); § 20–5C–6(12) (1981 Replacement Vol.) (Water Development Authority); § 21A–2–18 (1981 Replacement Vol.) (Department of Employment Security); § 24–1–8 (1981 Replacement Vol.) (Public Service Commission).

5. In the broadest sense, the term "attorney" denotes merely an agent or a substitute, a person appointed by another to act on his behalf. *Nardi v. Poinsatte,* 46 F.2d 347 (D.C.Ind.1931); *Fletcher v. Board of Education,* 323 Mich. 343, 35 N.W.2d 177 (1948); *Sherts v. Fulton Nat'l. Bank of Lancaster,* 342 Pa. 337, 21 A.2d 18 (1941). *See generally* Black's Law Dictionary 117 (5th ed. 1979); 4A Words and Phrases, "Attorney" (1969). When used in this sense, the term "attorney" may refer to a nonlawyer representative of another. *Application of Sposato,* 180 Misc. 933, 43 N.Y.S.2d 426 (1943). In common usage, however, the title "attorney" is understood to be synonymous with "attorney-at-law" or "lawyer" and denotes one who is schooled in the law and qualified to act for suitors or defendants in legal proceedings. *In re Page,* 257 S.W.2d 679 (Mo.1953). *See generally* Black's Law Dictionary, *supra;* 4A Words and Phrases, *supra;* Webster's Third New International Dictionary, "Attorney" (1964). In England, attorneys at law were a distinct kind of lawyer, in the same class as the "solicitor," as opposed to the "barrister," with distinct duties and functions. In this country an attorney at law may exercise all the functions of the English barrister, attorney and solicitor. *See* D. Walker, *The Oxford Companion to Law,* "Attorney" (1980).

perceives to be the interest of the state and the public at large.

However, the Attorney General's representation of the state as an entity and the discretion that accompanies such representation are limited and finite propositions. In some cases, such as in the areas of consumer protection and antitrust litigation, the Attorney General is statutorily charged as an administrator of the law and appears in civil proceedings on his own motion as the agent and legal representative of the state and the citizens thereof. W.Va.Code § 46A–7–101 *et seq.* (1980 Replacement Vol.); W.Va.Code § 47–18–6 *et seq.* (1980 Replacement Vol.). He is statutorily authorized to appear and "represent the interests of the State" in all cases in that special court of record, the Court of Claims. W.Va.Code § 14–2–11 (1979 Replacement Vol.). W.Va.Code § 5–3–2 provides that the Attorney General "shall appear in any cause in which the State is interested that is pending in any other court in the State, on the written request of the governor, and when such appearance is entered *he shall take charge of and have control of such cause ....*" (Emphasis added). He also has standing to exercise judgment in the role of a party litigant when he appears in this Court as counsel for the state in criminal appeals and other actions to which the State of West Virginia is a party. For, example, the Attorney General has the power and discretion to confess reversible error in criminal appeals before this Court.

■ The Attorney General performs quite a different function when he appears to defend a state officer who is sued in his official capacity. In this circumstance the Attorney General does not appear as a party to the action. That role is filled by the state officer against whom the suit is brought. Rather, the Attorney General's function is to act as legal advisor and agent of the officer-litigant and to prosecute or defend, within the bounds of the law, the decision or policy of such officer which is called into question by such lawsuit.

A problem arises, however, when, as here, the policy advocated by the state offi-

cer conflicts with what the Attorney General perceives to be the interest of the state. The respondent asserts that when such a conflict arises, the Attorney General's duty to represent the interests of the state takes preeminence over the interests the state officer seeks to advocate. After all, he argues, any suit brought against a state officer is, in effect, a suit against the state and the interests of the public must predominate.

■ We cannot agree with the Attorney General's characterization of his powers and duties with respect to suits against state officials. Ordinarily the state acts only through its officers and agents. Indeed, it has long been held that, in view of the constitutional prohibition contained in article 6, section 35 against the state being made a party defendant in any lawsuit, a civil action brought against a state officer or agency is not a suit against the state. *See Tompkins v. Kanawha Board,* 19 W.Va. 257 (1881). All state officers, whether elected or appointed, are sworn to uphold the constitutions of the United States and of the State of West Virginia and to execute faithfully the duties of their offices. W.Va. Const. art. 4, § 5. Upon their oath and in the performance of their statutorily prescribed duties, some officers, such as the Secretary of State, are empowered to make good faith policy decisions which implement the laws they administer and comport with the requirements of our constitutions. Furthermore, it is the duty of all state officers to interpret and implement the mandates of the constitutions. When the official policies of a particular state officer or agency are called into question in civil litigation, that officer or agency is entitled to the same access to the courts and zealous and adequate representation by counsel to vindicate the public interest, as is the private citizen to vindicate his personal rights.

■ The Legislature has designated the Attorney General as the legal representative of state officers and agencies sued in their official capacities. In the absence of other statutory or constitutional provision to the contrary, he is their sole legal repre-

sentative in the courts and they are his clients. When the Attorney General appears in litigation in this capacity, he does so as a lawyer and an officer of the court. *See State ex rel. Dostert v. Riggleman, supra; State ex rel. Summerfield v. Maxwell, supra.* His primary responsibility is to provide proper representation and competent counsel to the officer or agency on whose behalf he appears. The Attorney General's role in this capacity is not to make public policy in his own right on behalf of the state. It is presumed, in the absence of a contrary showing, that the officer made a party to the suit has, in the performance of his official duties, acted in contemplation of the constitution and in the best interests of the state. The Attorney General's role and duty is to exercise his skill as the state's chief lawyer to zealously advocate and defend the policy position of the officer or agency in the litigation.

The Legislature has thus created a traditional attorney-client relationship between the Attorney General and the state officers he is required to represent. It is well settled that in the control of litigation, the Attorney General has the duty to conform his conduct to that prescribed by the rules of professional ethics. 7A C.J.S. *Attorney General* § 12 (1980). As a lawyer and an officer of the courts of this State, the Attorney General is subject to the rules of this Court governing the practice of law and the conduct of lawyers, which have the force and effect of law. *See Denham v. Robinson, supra.*

Among the codified rules of this Court to which the Attorney General must conform his conduct is the Code of Professional Responsibility which is applicable to all lawyers in this state. Briefly, the Code mandates that the Attorney General shall assist in maintaining the integrity and competence of the legal profession; *shall assist the legal profession in fulfilling its duty to make legal counsel available;* shall assist in preventing the unauthorized practice of law; shall preserve the confidence and secrets of a client; *shall exercise independent professional judgment on behalf of a client; shall represent a client competently; shall represent a client zealously within the bounds of the law;* shall assist in improving the legal system; and *shall avoid even the appearance of professional impropriety.* In the instant case the Attorney General is particularly charged with the professional responsibilities which we have emphasized.

Since the Attorney General is designated as the statutory counsel for state officers sued in their official capacities, he is required by the Code of Professional Responsibility to make legal counsel available to those officers in such circumstances. The Attorney General is required to exercise his independent professional judgment on behalf of a state officer for whom he is bound to provide legal counsel. In this regard his duty is to analyze and advise his clients as to the permissible alternative approaches to the conduct of the litigation. The Attorney General should inform his client of the different legal strategies and defenses available and of his professional opinion as to the practical effect and probability of the outcome of each alternative, so as to enable the officer to make an intelligent decision with respect to how the litigation could be conducted. *He should then stand aside and allow his client to exercise his independent judgment on which course to pursue.* We emphasize the importance of this independent judgment because "advice of counsel" is not a defense to civil or criminal liability for nonfeasance, misfeasance or malfeasance in office. Once the state officer whom the Attorney General represents has determined the course he desires the litigation to take, it is the duty of the Attorney General to zealously advocate the public policy positions of his client in pleadings, in negotiations, and in the courtroom and to avoid even the appearance of impropriety by appearing to be in conflict with the desires of his client.

In summary, the Attorney General's statutory authority to prosecute and defend all actions brought by or against any state officer simply provides such officer with access to his legal services and does not authorize the Attorney General

"to assert his vision of state interest." *Motor Club of Iowa v. Dept. of Transportation,* 251 N.W.2d 510, 514 (Iowa 1977).[6] The Attorney General stands in a traditional attorney-client relationship to a state officer he is required by statute to defend. His authority to manage and control litigation on behalf of a state officer is limited to his professional discretion to organize legal arguments and to develop the case in the areas of practice and procedure so as to reflect and vindicate the lawful public policy of the officer he represents. The Attorney General is not authorized in such circumstances to place himself in the position of a litigant so as to represent his concept of the public interest, but he must defer to the decisions of the officer whom he represents concerning the merits and the conduct of the litigation and advocate zealously those determinations in court.

■ The facts of this case show that the petitioner has not received representation to which he is lawfully and ethically entitled. The Secretary of State has no statutory authority to hire outside counsel. Indeed, he is forbidden by law from spending public funds to hire legal counsel. The Secretary of State is therefore totally dependent upon the Attorney General for legal representation. By not receiving such representation the petitioner has been deprived of his due process right to counsel and his right of access to the courts. As the Iowa Court stated in *Motor Club of Iowa v. Dept. of Transportation, supra:*

> In our society and under our system of law the nature, scope, indeed the very existence of all rights and obligations turn on what would be decreed if those involved went to court. Governmental departments and agencies, in common

with individuals, must ultimately resort to the courts and must submit to the court's decrees to effectuate their acts or to be made to comply with the lawful acts of others. Access to the courts gives life to the affairs of governmental departments and agencies. For government to properly function that access must be unimpeded.

To accord the attorney general the power he claims would leave all branches and agencies of government deprived of access·to the court except by his grace and with his consent. In a most fundamental sense such departments and agencies would thereby exist and ultimately function only through him. 251 N.W.2d at 516.

We adopt this view.

■ Due process requires that every defendant be given his day in court. *State ex rel. Staley v. Hereford,* 131 W.Va. 84, 45 S.E.2d 738 (1947). In addition, it is fundamental to due process that all suitors and defendants have a right to be effectively represented by counsel in legal proceedings. *See, e.g., State ex rel. Wine v. Bordenkircher,* 160 W.Va. 27, 230 S.E.2d 747 (1976); *Sisler v. Hawkins,* 158 W.Va. 1034, 217 S.E.2d 60 (1975); *State ex rel. Widmyer v. Boles,* 150 W.Va. 109, 144 S.E.2d 322 (1965). As we have already stated, state officers are entitled to have their lawful public policy decisions vindicated in the courts just as individuals are entitled to vindicate their personal rights at law. The courts must be open to all. When the Attorney General refuses to fulfill his duty, as required by law, to provide effective legal assistance to a state officer involved in litigation, such refusal would operate to deny due process.

---

**6.** We are aware of the many decisions from other jurisdictions cited by the respondent for the proposition that the Attorney General has exclusive control of litigation. We find the majority of them inapplicable to the case at bar. In some of these jurisdictions, the Attorney General retains the common law powers and duties of his office. *See, e.g., State ex rel. Carmichael v. Jones,* 252 Ala. 479, 41 So.2d 280 (1949); *People ex rel. Scott v. Briceland,* 65 Ill. 485, 3 Ill.Dec. 739, 359 N.E.2d 149 (1976); *Feeney v. Com.,* 373 Mass. 359, 366 N.E.2d 1262 (1977); *Secretary of Administration and Finance v. At-* torney General, 367 Mass. 154, 326 N.E.2d 334 (1975); *State ex rel. Board of Transportation v. Fremont, E. & M.V.R. Co.,* 22 Neb. 313, 35 N.W. 118 (1887); *State ex rel. Derryberry v. Kerr-McGee Corp.,* 516 P.2d 813 (Okl.1973). In others, the Attorney General is granted the power to control litigation by statute or constitutional provision. *See, e.g., State ex rel. Morrison v. Thomas,* 80 Ariz. 327, 297 P.2d 624 (1956); *State v. Texas Co.,* 199 La. 846, 7 So.2d 161 (1942); *Lyle v. Luna,* 65 N.M. 429, 338 P.2d 1060 (1959). As we have shown, neither of these circumstances are present in this case.

■ If, in the course of advising or counseling a state officer involved in litigation, it becomes apparent that the Attorney General is unable to adequately represent the officers as required by law or that such representation would create professional conflicts or adversity, the Attorney General must appoint counsel to represent such officer. The Legislature has made provision for such appointment. By the terms of W.Va.Code § 5–3–2, the Attorney General

> may require the several prosecuting attorneys to perform, within the respective counties in which they are elected, any of the legal duties required to be performed by the attorney general which are not inconsistent with the duties of the prosecuting attorneys as the legal representatives of their respective counties; when the performance of any such duties by the prosecuting attorney conflicts with his duties as the legal representative of his county, or for any reason any prosecuting attorney is disqualified from performing such duties, the attorney general may require the prosecuting attorney of any other county to perform such duties in any county other than that in which such prosecuting attorney is elected ....

W.Va.Code § 7–4–1 (1976 Replacement Vol.) requires prosecuting attorneys to comply with such a request. In addition, the Attorney General may make provisions for appointment of other of his staff to the case, or he may hire, out of his own appropriated budget, outside counsel as assistant attorneys general to act as the legal representatives of such officer if the conflict or adversity is of such magnitude that the Attorney General's staff and the prosecuting attorneys are unable to represent adequately the position of the defendant officer. W.Va.Code § 5–3–3 (1979 Replacement Vol.).

The respondent raises two additional issues which we can dispose of briefly. The respondent contends that in this case the petitioner was merely a nominal party who was sued in his official capacity only as an agent for service of process upon the State of West Virginia. The respondent asserts that the real party in interest is the Legislature who, as the representative of the people of the state, enacted the statutory provision which was the subject of the federal litigation. Consequently, the respondent asserts, the petitioner was not entitled to counsel and cannot maintain this action in mandamus.

■ The original lawsuit was brought to have the apportionment statute declared unconstitutional and to enjoin the petitioner from requiring candidates for Congress to file "at large." The petitioner is the chief elections officer of the state, W.Va.Code § 3–1A–6 (1979 Replacement Vol.), and is required to accept filings of announcements of candidacy, W.Va.Code § 3–5–7 (1979 Replacement Vol.), and to certify those candidates entitled to have their names placed on the primary election ballots. W.Va.Code § 3–5–9 (1979 Replacement Vol.). The petitioner clearly was an essential party to the litigation and had a real interest in the outcome thereof in his official capacity as Secretary of State. If the plaintiff in the federal litigation sought to force the Legislature to act, it is the Legislature or the officers thereof, she should have sued.

The respondent also asserts that it is the duty of the Attorney General to defend the constitutionality of legislative enactments. He argues that if the petitioner here had been afforded counsel by the Attorney General in the lawsuit in federal court, it would have required him to compromise his duty by arguing against a constitutional construction of the statute. We do not agree.

■ Both the Attorney General and the Secretary of State are under oath to uphold the federal and state constitutions. These constitutions are contracts by the people which limit their government and are the supreme law of the land. In this respect, the Attorney General has no responsibility, except his professional responsibility as a lawyer, different than that of other officers of the executive to defend the constitutionality of statutes. In the discharge of his official duties, the Secretary of State may make a good faith determination that a

statute which he is required to administer or implement is unconstitutional. To hold otherwise would be to abrogate the oath which that officer takes to support the constitution. This is not to say that an executive officer may irresponsibly decline to enforce statutory provisions on the ground that they are unconstitutional. If, however, he makes a good faith determination that a particular legislative enactment violates the fundamental principles of our constitution, that determination cannot be disregarded by the Attorney General. The officer has not only the right, but also the duty to confess well-founded defects and thereby avoid pointless and uneconomical litigation.

We conclude, upon the record submitted and for the reasons stated, that it is the duty of the Attorney General to provide the Secretary of State with adequate, effective legal representation.

Writ awarded.

NEELY, Justice, dissenting:

I dissent from the majority's opinion. At the outset, let me disassociate myself entirely from any suggestion of impropriety the Attorney General may infer from the majority's lengthy peroration on professional ethics. To the extent that the majority finds in the *Code of Professional Responsibility* guidance about the political role of the office of the Attorney General, I disagree,[1] and to the extent that there is an implied criticism of the Attorney General, I will have no part in it.

I

The majority asserts for the Attorney General a role analogous to a legal aid attorney for State employees sued in their official capacity, and concludes that he is therefore bound to advocate zealously the personal opinions of the officer whom he represents. This position is untenable.

The West Virginia *Code* states that "the attorney general shall appear as counsel for the State in all causes pending ... in any federal court, in which the State is interested; ... he shall defend all actions and proceedings against any State officer in his official capacity ... when the State is not interested in such cause against such officer, but should the State be interested against such officer, he shall appear for the State ...." *W.Va.Code*, 5–3–2 [1972]. The Attorney General's primary duty is clearly to the State. He is not empowered to act as counsel for State employees, except to the extent that prosecution of the employee's interest is compatible with the interests of the State.

In this case the majority admits in their opinion that "[t]he Secretary of State ... agreed with the plaintiff in the civil action that the existing apportionment statute was unconstitutional." If the Attorney General must defend this point of view of Mr. Manchin, then there is no true adversarial relationship between the parties; such a trial would be a sham. This Court has in the past recognized the importance of maintaining a true adversarial relationship, stating that "[a]t law, persons jointly interested in the object of the suit must stand on the same side of the case upon the record, ..." *Sadler v. Taylor*, 49 W.Va.

---

1. Sir William Holdsworth explains at some length the political forces which, by the end of the fifteenth century in England, "have caused the King's attorney to become an official wholly different from the ordinary professional attorney, and have thus given to his office a wholly unique character." Holdsworth, *A History of English Law*, vol VI; Methuen & Co. Ltd. and Sweet & Maxwell Ltd., London, 1971; p. 469. Whatever permutations the office of attorney general may have gone through since then, obvious and important distinctions remain. Most notably, as I discuss in the text, *infra*, the Attorney General is only obligated to defend an officer sued in his official capacity to the extent of

that official capacity. His primary duty has always been, is now, and should always be to the State. In this sense, State officials are not entitled to the services of the office of the Attorney General in a traditional attorney-client relationship.

While I have the floor, I will also take issue with the majority's attempt at historical scholarship. I find the use of the term "*attornatus regis*" as early as 38 Henry III (A.D. 1254). The first general patent, giving to Thomas Derham "The power to act for the King in the Common Bench and 'all our other courts'", is dated July 13, 9 Henry IV (A.D. 1408). Holdsworth, vol. VI, at 459, n. 3, and 460.

104, 115, 38 S.E. 583, 587 (1901). I do not understand why these basic principles of the adversary system have suddenly become obsolete.

If in the case at bar Mr. Manchin were threatened with personal liability, or if the Secretary of State exercised any policy-making authority, I might be willing to confer on Secretary Manchin some degree of participation in what would, in either of those circumstances, be in some sense "his" litigation. Neither, however, is here the case. Under West Virginia law, a public officer acting within the scope of his authority in performance of his official duties may not be held civilly liable for consequences of his acts, unless it is shown that he acted willfully, maliciously or corruptly, *Kondos v. West Virginia Board of Regents*, 318 F.Supp. 394 (S.D.W.Va.1970), *aff'd.*, 4th Cir., 441 F.2d 1172, so this case poses no personal threat to Mr. Manchin.

Furthermore, the *West Virginia Code* gives the Secretary of State no policy-making authority. The governmental role of Mr. Manchin as the Secretary of State is described in several statutes. *W. Va. Code*, 5–2–1 [1923], charges the Secretary of State with the clerical duties of the Executive Department. *W. Va. Code*, 5–2–2 [1923], empowers the Secretary to administer oaths. *W. Va. Code*, 3–1–3a [1971], directs the Secretary of State to implement the federal Voting Rights Act Amendments of 1970. Most importantly, *W. Va. Code*, 3–1A–6 [1974] establishes the Secretary of State as the chief election official of the State, and gives him "authority ... to make, amend and rescind such rules, regulations and orders as may be necessary *to carry out the policy of the legislature* ...." (emphasis added).

The majority cites Article 7, Section 1 of the *West Virginia Constitution* for the proposition that the role of the Attorney General is limited to his statutory grant of authority. This same section applies as well to the office of Secretary of State. As the *Code* makes plain, the people of West Virginia have delegated no duties to the Secretary of State that would empower him to ignore or countermand the directions of the legislature. His authority is not to carry out such of the legislature's policy as he considers to be constitutional, but to carry out the policy of the legislature as contained in the duly enacted statutes. His opinions about the constitutionality of statutes, however well-founded or well-intentioned, are personal to him.

Secretary Manchin has no interest in the question of constitutionality beyond that of an ordinary citizen. His duty is to administer the legislative policy, however construed. "One who accepts a public office ... subjects himself to all constitutional and legislative provisions relating to the office, and undertakes to perform all the duties imposed on its occupant; and while he remains in such office he must perform all such duties" *State ex rel. Preissler v. Dostert*, 163 W.Va. 719, 260 S.E.2d 279, 286 (1979).

I search in vain for any provision authorizing the disbursement of state funds to vindicate the personal opinions of ministerial employees on constitutional issues in a court of law. I commend the majority on their acuity—in the tradition of Peter Pan, they are able to locate a provision which, like Tinkerbell, appears to vanish whenever a grown-up enters the room.

To take the control of the State's case away from the "chief 'law-trained' officer of the State" and inject the opinions of a clerical officer who has no legal training is nonsensical. It raises the possibility of collusive lawsuits in the future between plaintiffs and sympathetic nominal defendants, and injects into litigation an element which may very well be antagonistic to the interests of the State, and is beyond normal political control. A ministerial employee is not held accountable for his political opinions precisely because, from a political point of view, he is entitled to none. With this decision, the Court has granted to clerks and nominal parties an unpoliced political vote, and secured for that vote the paid, zealous advocacy of the State Attorney General.

II

The majority cites as authority for their holding the case of *Motor Club of Iowa v.*

*Department of Transportation*, Iowa, 251 N.W.2d 510, decided in 1977 by the Iowa Supreme Court. The vast weight of authority has, unsurprisingly, held contrary to our majority (as the majority opinion itself admits). In order to distinguish away these cases, my brothers have indulged themselves in some extremely fine—in fact, questionable—distinctions. With cases that appear to support their extraordinary view they have been less painstaking. An illustration of this intellectual relaxation is to be found in their selection of the Iowa case as authority for their position. The majority has missed a glaring and obvious distinction between *Motor Club, supra,* and the case at bar. In fact, the distinction they have missed turns the precedent against them.

The 65th General Assembly of the State of Iowa established a Department of Transportation, and delegated to it certain functions. Among those functions was the duty of the Commission of the Department of Transportation to "adopt rules ... governing the length of vehicles and combinations of vehicles ...." *Iowa Code* § 307.10(5). Pursuant to this authority the commission voted to establish a 65-foot limit, but a trial court held that rule invalid. While the case was on appeal, personnel on the commission changed, the majority became the minority, and the commission attempted to dismiss the appeal in order to abide by the (now-favorable) ruling of the trial court. It was at this point that the Iowa attorney general interfered, and sought to continue the appeal against the wishes of the commission.

The distinction is this: in *Motor Club* the government officers resisting the attorney general's interference were doing so on a matter over which they had an *express grant* of rule-making authority from the legislature, and were acting within the ambit of that authority. The commission was qualified to make the law, had had that task entrusted to it, and was acting within its bounds. I wholeheartedly endorse the decision of the Iowa court on these facts. I, too, think the Iowa court is right. I think the Iowa justices have written a fine opinion. But where, as in our case, a nom-

inal plaintiff is not entrusted with policy-making authority and is required by statute to bow to the policies of the legislature, *Motor Club* simply does not apply.

Our legislators, in entrusting to the Secretary of State limited rule-making authority in order that he may carry out legislative policies, could hardly have expected that Mr. Manchin would turn on them and attack legislative enactments under color of that authority, and could even less have imagined that this Court would not only countenance, but endorse, such actions. Where the political process neither solicits nor endorses a government officer's opinions on a matter, he is not entitled forcibly to inject those opinions into that process in any other than a purely advisory manner. He is certainly not entitled to substitute his personal views for those of the State as expressed in its duly enacted legislation, nor to interfere with the State officer charged to "appear as counsel for the State in all causes ... in which the State is interested." *W.Va.Code,* 5–3–2 [1972].

### III

The majority seeks to assert that the petitioner was "an essential party" to the litigation, and had a "real interest" in the outcome. They do not define these terms, nor do they explain their assertion. With sloppy language the majority has attempted to obscure the fact that the doctrines at which they hint do not support their conclusions. This is understandable, for had they been precise they would have found themselves obliged to rewrite entire bodies of law.

In order to have any meaning at all, "essential party" must refer to "necessary" or "indispensable" parties. Under the four-part test created by this Court in *Pioneer Co. v. Hutchinson,* 159 W.Va. 276, 220 S.E.2d 894 (1975) Secretary Manchin is not an indispensable party: (1) He has no interest distinct or severable from the question of the statute's constitutionality; (2) In his absence the federal court could have rendered justice between the parties before it; (3) Any decree the Court would

make would have had no injurious effect on any legitimate interest of his; (4) A final determination arrived at by the Court without his presence would neither have been inconsistent with equity, or with good conscience. This analysis is consistent with that of Professor Lugar. Commenting on Rule 19, *W. Va. R.C.P.*, he states that indispensable parties are parties "who ought to be parties if complete relief is to be accorded between those already parties." Lugar and Silverstein, *West Virginia Rules*, p. 171. Since the Secretary of State admittedly agrees with the plaintiffs in the federal case, complete relief can be granted in this case without his interference.

A "necessary" party is similar to an "indispensable" party. A necessary party has been stated to "have an interest in the controversy, but one which is separable from that of parties before the Court" as opposed to an indispensable party, who has "an interest in the controversy of such a nature that a final decree cannot be made without affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." 14A M.J., *Parties* § 3. His position as Secretary of State confers neither such interest on Mr. Manchin, and he would not have been considered either "necessary" or "indispensable" had he not been selected as the nominal party.

The majority also states that Mr. Manchin, or the office of the Secretary of State, (it is not clear which, the majority simply says "petitioner"), has a "real interest" in the outcome of the suit. Once again the majority has used language resembling terms used to describe accepted legal doctrines in order to call to mind those doctrines without being required to reconcile those doctrines with the opinion. To be given any meaning at all, the "real interest" language used by the majority must be deemed to refer to the "real party in interest" doctrine.

The "real party in interest" doctrine, as it applies to defendant states and state officers, contemplates the State to be the real party in interest where the State has "a substantial interest in the outcome of the suit", *State of West Virginia v. Haynes*, 348 F.Supp. 1374, 1377 (S.D.W.Va. 1972). The pettifoggerous language used by the majority represents their attempt to counter the Attorney General's assertion that Secretary Manchin is a merely nominal party. No number of misapplied legal "analogies" can change the fact that on this point the Attorney General is right.

As the federal Supreme Court has made clear, there are circumstances in which injunctive relief may be sought in federal court against a defendant state. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). These suits are made possible by the nominal party device, since the doctrine expounded in *Ex parte Young, supra,* removes the Eleventh Amendment bar only in suits against state officers, not in suits against the State or its agencies. *National Ass'n for the Advancement of Colored People v. California*, 511 F.Supp. 1244 (D.C.Cal.1981). "To be sure," one authority has observed, "the doctrine of *Ex parte Young* has a fictive quality to it; nonetheless, it serves as an effective mechanism for providing relief against unconstitutional conduct by state officers and for testing the constitutionality of the state statutes under which they act." Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3524. The nominal party device is part of a package of judicially endorsed procedural devices which serve the policy of seeing to it that constitutional claims against states are not procedurally stymied. The usual procedure in such a case is to sue the State through a nominal party—thereby sidestepping any sovereign immunity problems—and to bring an action for an extraordinary writ under the All Writs Act, 28 U.S.C. 1651 (1949), to avoid the procedural delays and frustrations of the declaratory judgment format. The majority's discussion of the nominal party doctrine shows a flagrant misunderstanding of the history and purpose of this rather common device.

Lastly, I will point out that it is left to the plaintiff to select his nominal party,

and any state official whose duties include the supervision or implementation of some necessary aspect of the matter in dispute will do. The selection of the Secretary of State as the nominal party on whom to serve the federal complaint was a reasonable one, but by no means necessary. The plaintiffs in the federal suit could equally well have served the clerks of the Senate and House of Delegates and brought an action for a writ of mandamus to demand that the apportionment bill be disenrolled. The State Treasurer or the State Auditor could have been selected as the nominal plaintiff in an action for a writ of mandamus to prevent the disbursement of state funds to pay for any election alleged by the plaintiff to be unconstitutional. All fifty-five county clerks could have been named in an action to prohibit the operation of the polls in any county where the elections were to be run in an allegedly unconstitutional manner. The list of potential nominal parties goes on, but I have mentioned enough to make my point.

I suppose, at least, that we can all be grateful that the plaintiffs in the federal suit were unimaginative in their selection of a nominal party defendant. I suspect that even the hardiest federal judge would quail at the sight of fifty-five clamoring county clerks, each with legal counsel provided by the Attorney General, and each set on taking advantage of this Court's new rule granting nominal parties the right to attempt to vindicate their personal opinions at the expense of the State, and against her interests.